No. 22-40043

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

FEDS FOR MEDICAL FREEDOM; LOCAL 918, AMERICAN
FEDERATION OF GOVERNMENT EMPLOYEES; HIGHLAND
ENGINEERING, INCORPORATED; RAYMOND A. BEEBE, JR.;
JOHN ARMBRUST; et al.,

Plaintiffs-Appellees,

v.

JOSEPH R. BIDEN, JR., in his official capacity as President of the
United States; THE UNITED STATES OF AMERICA; PETE
BUTTIGIEG, in his official capacity as Secretary of Transportation;
DEPARTMENT OF TRANSPORTATION; JANET YELLEN, in her
official capacity as Secretary of Treasury; et al.,

Defendants-Appellants.

_____

On Appeal from the U.S. District Court
for the Southern District of Texas

_____

**BRIEF FOR APPELLEES**

_____

C. Boyden Gray
R. Trent McCotter
  *Counsel of Record*
Jonathan Berry
Michael Buschbacher
Jared M. Kelson
BOYDEN GRAY & ASSOCIATES
801 17th Street NW., Suite 350
Washington, DC 20006
202-706-5488
mccotter@boydengrayassociates.com
*Counsel for Plaintiffs-Appellees*

# CERTIFICATE OF INTERESTED PERSONS

## *Feds for Medical Freedom v. Biden*

No. 22-40043

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.  Highland Engineering, Inc., is a Plaintiff-Appellee. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

2.  Local 918, American Federation of Government Employees, is a Plaintiff-Appellee. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

3.  Feds for Medical Freedom, a/k/a Feds 4 Med Freedom, is a Plaintiff-Appellee. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

4.  Members of Feds for Medical Freedom are interested parties. Feds for Medical Freedom has over 6000 members. *See* L.R. 28.2.2 ("If a

large group of persons or firms can be specified by a generic description, individual listing is not necessary.").

The following are individual named Plaintiffs-Appellees:

5.  John Armbrust

6.  N. Anne Atkinson

7.  Julia Badger

8.  Michael Ball

9.  Raymond A. Beebe, Jr.

10. Craigan Biggs

11. Laura Brunstetter

12. Mark Canales

13. Michele Caramenico

14. Andrew Chamberland

15. David Clark

16. Diane Countryman

17. Kevin Dantuma

18. Jose Delgado

19. Jordan DeManss

20. George Demetriou

21.   Keri Divilbiss

22.   Mercer Dunn IV

23.   William Filkins

24.   Jonathan Gragg

25.   Bryon Green

26.   Thomas David Green

27.   Erika Hebert

28.   Peter Hennemann

29.   Neil Horn

30.   Carey Hunter-Andrews

31.   Tana Johnston

32.   Tyler Klosterman

33.   Deborah Lawson

34.   Dan Lewis

35.   Melissa Magill

36.   Kendra Ann Marceau

37.   Dalia Matos

38.   Stephen May

39.   Steven McComis

40. Christopher Miller

41. Joshua Moore

42. Brent Moores

43. Jesse Neugebauer

44. Joshua Nicely

45. Leslie Carl Petersen

46. Patti Rivera

47. Joshua Roberts

48. Ashley Rodman

49. M. LeeAnne Rucker-Reed

50. Trevor Rutledge

51. Nevada Ryan

52. James Charles Sams III

53. Michael Schaecher

54. Christina Schaff

55. Kurtis Simpson

56. Barrett Smith

57. Jaci ReNee Smith

58. Jarod Smith

59.   Jana Spruce

60.   John Tordai

61.   Sandor Vigh

62.   Christine Vrtaric

63.   Pamela Weichel

64.   David Wentz

65.   Jason Wilkerson

66.   Patrick Wright

67.   Patrick Mendoza York

The following are individual named Defendants-Appellants:

68.   Kiran Ahuja, in her official capacities as Director of the Office of Personnel Management and Co-Chair of Safer Federal Workforce Task Force

69.   Lloyd J. Austin III, in his official capacity as Secretary of Defense

70.   Joseph R. Biden, Jr., in his official capacity as President of the United States

71.   Antony Blinken, in his official capacity as Secretary of State

72.   Matthew C. Blum, in his official capacity as Federal Acquisition Regulatory Council member

73. William J. Burns, in his official capacity as Director of the Central Intelligence Agency

74. Pete Buttigieg, in his official capacity as Secretary of Transportation

75. Robin Carnahan, in her official capacities as Administrator of the General Services Administration and Co-Chair of Safer Federal Workforce Task Force

76. Leslie A. Field, in her official capacity as Federal Acquisition Regulatory Council member

77. Marcia Fudge, in her official capacity as Secretary of Housing and Urban Development

78. Merrick B. Garland, in his official capacity as Attorney General

79. Jennifer M. Granholm, in her official capacity as Secretary of Energy

80. Deb Haaland, in her official capacity as Secretary of Interior

81. Avril Haines, in her official capacity as Director of National Intelligence

82. Daniel Hokanson, in his official capacity as Chief of the National Guard Bureau

83. Karla S. Jackson, in her official capacity as Federal Acquisition Regulatory Council member

84. Kilolo Kijakazi, in her official capacity as Acting Commissioner of Social Security

85. Jeffrey A. Koses, in his official capacity as Federal Acquisition Regulatory Council member

86. Alejandro Mayorkas, in his official capacity as Secretary of Homeland Security

87. Denis McDonough, in his official capacity as Secretary of Veterans Affairs

88. Bill Nelson, in his official capacity as Administrator of the National Aeronautics and Space Administration

89. Samantha Power, in her official capacity as Administrator of the United States Agency for International Development

90. Gina M. Raimondo, in her official capacity as Secretary of Commerce

91. John M. Tenaglia, in his official capacity as Federal Acquisition Regulatory Council member

92. Tom Vilsack, in his official capacity as Secretary of Agriculture

93. Marty Walsh, in his official capacity as Secretary of Labor

94. Janet Yellen, in her official capacity as Secretary of Treasury

95. Shalanda D. Young, in her official capacity as Acting Director of the Office of Management and Budget

96. Jeffrey Zients, in his official capacity as co-chair of the Safer Federal Workforce Task Force

The following government entities are Defendant-Appellants:

97. Central Intelligence Agency

98. Department of Agriculture

99. Department of Commerce

100. Department of Defense

101. Department of Energy

102. Department of Homeland Security

103. Department of Housing and Urban Development

104. Department of Interior

105. Department of Justice

106. Department of Labor

107. Department of State

108. Department of Transportation

109. Department of Treasury

110. Department of Veterans Affairs

111. Federal Acquisition Regulatory Council

112. General Services Administration

113. National Aeronautics and Space Administration

114. National Guard Bureau

115. Office of Management and Budget

116. Office of Personnel Management

117. Office of the Director of National Intelligence

118. Safer Federal Workforce Task Force

119. Social Security Administration

120. The United States of America

121. United States Agency for International Development

    The following are counsel in the case:

122. Boyden Gray & Associates PLLC: C. Boyden Gray, R. Trent McCotter, Jonathan Berry, Michael Buschbacher, and Jared M. Kelson are counsel for Plaintiffs-Appellees.

123. U.S. Department of Justice: Brian M. Boynton, Sarah Wendy Carroll, Marleigh D. Dover, Brit Featherston, James Gillingham,

Sarah E. Harrington, Casen Ross, Charles W. Scarborough, and

Lowell V. Sturgill Jr. are counsel for Defendants-Appellants.

Dated: February 16, 2022          /s/ R. Trent McCotter
                                  R. Trent McCotter
                                  *Counsel of Record for Petitioner*

## STATEMENT REGARDING ORAL ARGUMENT

The Court has set this matter for oral argument on March 8, 2022.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..........................................i

STATEMENT REGARDING ORAL ARGUMENT .................................xi

TABLE OF CONTENTS ..........................................................................xii

TABLE OF AUTHORITIES .................................................................xiv

INTRODUCTION ....................................................................................1

STATEMENT OF JURISDICTION .........................................................8

STATEMENT OF THE ISSUES..............................................................8

STATEMENT OF THE CASE .................................................................9

    I.    Factual Background................................................................9

    II.   District Court Proceedings....................................................10

SUMMARY OF THE ARGUMENT .......................................................11

STANDARD OF REVIEW.....................................................................13

ARGUMENT ........................................................................................14

    I.    The District Court Correctly Held That The President
        Lacks Authority to Issue the Mandate. ...............................14

        A.    The Government's CSRA Theory Is Precluded by
              Forty Years of Precedent. ..........................................15

            1.    Binding Precedent Holds that the CSRA Does
                  Not Preclude Plaintiffs' Claims.............................16

            2.    Conducting the Preclusion Analysis Anew Yields
                  the Same Result......................................................23

B.   The District Court Correctly Held that the Mandate Is Ultra Vires. .......................................................... 31

1.   The President Lacks Statutory Power to Issue the Mandate. ........................................................ 31

2.   Several Clear-Statement Doctrines Confirm the Lack of Statutory Authority. ................................. 40

3.   The President Lacks Inherent Article II Power to Issue the Mandate. .................................... 44

C.   Agencies' Implementation of the Mandate Violates the APA. ..................................................... 47

1.   Lack of Reasoned Decisionmaking. ....................... 50

2.   Agencies' Implementations Are Inconsistent, Illogical, and Contrived. ....................................... 53

II.   The District Court Did Not Abuse Its Discretion in Finding that Plaintiffs Face Imminent, Irreparable Harm. 55

III.   The District Court Did Not Abuse Its Discretion in Finding that the Public Interest and Balance of Harms Favor Plaintiffs. ..................................................... 60

IV.   The District Court Did Not Abuse Its Discretion in Finding that Broad Relief Is Appropriate. ........................... 65

CONCLUSION ........................................................ 69

CERTIFICATE OF COMPLIANCE ...................................... 70

CERTIFICATE OF SERVICE .......................................... 71

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adams v. Woods*, 6 U.S. (2 Cranch) 336 (1805) ...................................... 33

*Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485 (2021).......... 39, 41, 59, 63

*A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) ......................................................................................... 4

*Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359 (1998) ...... 50

*Altschuld v. Raimondo*, No. 1:21-cv-2779, 2021 WL 6113563 (D.D.C. Nov. 8, 2021) ......................................................................... 15

*AFGE v. Biden*, No. 1:21-cv-23828 (S.D. Fla. Dec. 22, 2021) ............... 15

*AFGE v. FLRA*, 794 F.2d 1013 (5th Cir. 1986)...................................... 17

*AFGE v. Sec'y of the Air Force*, 716 F.3d 633 (D.C. Cir. 2013) ............. 22

*AFGE v. Trump*, 929 F.3d 748 (D.C. Cir. 2019) .................................... 22

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015) ............ 64

*Arnett v. Kennedy*, 416 U.S. 134 (1974) ................................................ 59

*Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897 (5th Cir. 1983) ................................................................................. 47

*Batterton v. Marshall*, 648 F.2d 694 (D.C. Cir. 1980) ........................... 48

*Berkley v. Mountain Valley Pipeline, LLC*, 896 F.3d 624 (4th Cir. 2018)................................................................................. 26

*Biden v. Missouri*, 142 S. Ct. 647 (2022) ............................................... 54

*Broadway v. Block*, 694 F.2d 979 (5th Cir. 1982) .................................. 19

*BST Holdings, LLC v. OSHA*, 17 F.4th 604
(5th Cir. 2021) .................................... 15, 27, 40, 41, 43, 44, 54, 55, 60

*Burgess v. FDIC*, 871 F.3d 297 (5th Cir. 2017) ............................... 55, 57

*Califano v. Yamasaki*, 442 U.S. 682 (1979) ............................ 65

*Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322
(D.C. Cir. 1996) ................................................. 30, 31, 47

*Church v. Biden*, No. 1:21-cv-2815, 2021 WL 5179215
(D.D.C. Nov. 8, 2021) ........................................................ 15

*Cochran v. SEC*, 20 F.4th 194 (5th Cir. 2021) ...................... 6, 21, 23–30

*Coliseum Square Ass'n v. Jackson*, 465 F.3d 215 (5th Cir. 2006) .......... 47

*Dep't of Com. v. New York*, 139 S. Ct. 2551 (2019) ............................... 54

*DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891
(2020) ................................................................. 39, 47, 53

*E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021) ..... 47

*Elgin v. Treasury*, 567 U.S. 1 (2012) ..................................... 6, 21, 25, 29

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) ................. 51

*FDIC v. Nelson*, 19 F.3d 15 (5th Cir. 1994) ............................ 68

*FLEOA v. Cabaniss*, No. 1:19-cv-735, 2019 WL 5697168
(D.D.C. Nov. 4, 2019) ....................................................... 22

*FLEOA v. Rigas*, No. 1:19-cv-735, 2020 WL 4903843
(D.D.C. Aug. 20, 2020) ...................................................... 20

*Foley v. Biden*, No. 4:-21-cv-1098 (N.D. Tex. Oct. 6, 2021) .................... 15

*Fornaro v. James*, 416 F.3d 63 (D.C. Cir. 2005) ................................... 19

*Gahagan v. USCIS*, 911 F.3d 298 (5th Cir. 2018) ................................ 23

*Garcia v. United States*, 680 F.2d 29 (5th Cir. 1982) ........................... 19

*Georgia v. Biden,* No. 1:21-cv-163, ___ F. Supp. 3d ___,
   2021 WL 5779939 (S.D. Ga. Dec. 7, 2021).................................. 63, 67

*Gonzalez v. Manjarrez*, 558 F. App'x 350 (5th Cir. 2014)..................... 19

*Greiner v. United States*, 900 F.3d 700 (5th Cir. 2018) ........................ 19

*Gundy v. United States*, 139 S. Ct. 2116 (2019) .............................. 42, 43

*Humana, Inc. v. Avram A. Jacobson, M.D.*, 804 F.2d 1390
   (5th Cir. 1986) ............................................................................... 55

*Humphrey's Executor v. United States*, 295 U.S. 602 (1935)................. 45

*In re MCP No. 165*, 20 F.4th 264 (6th Cir. 2021) ...................... 42, 44, 45

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607
   (1980) ............................................................................................. 43

*Kentucky v. Biden*, 23 F.4th 585 (6th Cir. 2022) ............. 5, 38, 40, 44, 46

*Kreschollek v. S. Stevedoring Co.*, 78 F.3d 868 (3d Cir. 1996) .............. 27

*League of Women Voters of United States v. Newby*, 838 F.3d 1
   (D.C. Cir. 2016) ............................................................................. 66

*Louisiana v. Becerra*, No. 3:21-cv-03970 (W.D. La.), *appealed*,
   No. 21-30734 (5th Cir.) ................................................................. 63

*Louisiana v. Becerra*, 20 F.4th 260 (5th Cir. 2021) ........................ 67, 68

*McAuliffe v. McGovern*, No. CIV. SA-89-CA-0028, 1991 WL 352482
   (W.D. Tex. July 23, 1991) .............................................................. 19

*McAuliffe v. Rice*, 966 F.2d 979 (5th Cir. 1992) .................................... 19

*McCray v. Biden*, No. 1:21-cv-2882, 2021 WL 5823801
   (D.D.C. Dec. 7, 2021)..................................................................... 15

*Missouri v. Biden*, No. 4:21-cv-01329-MTS, 2021 WL 5564501
(E.D. Mo. Nov. 29, 2021) .............................................. 51, 52

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.
Co.*, 463 U.S. 29 (1983) ....................................................... 50

*Morrison v. Olson*, 487 U.S. 654 (1988) ................................ 15

*Myers v. United States*, 272 U.S. 52 (1926) ..................... 5, 45

*NFFE v. Weinberger*, 818 F.2d 935 (D.C. Cir. 1987) ............. 18

*NFIB v. Dep't of Labor*, 142 S. Ct. 661 (2022) .....1, 3, 4, 31, 35, 38, 39, 41

*NTEU v. Bush*, 891 F.2d 99 (5th Cir. 1989) ..................... 17, 26

*NTEU v. Devine*, 733 F.2d 114 (D.C. Cir. 1984) ............. 16, 19

*NTEU v. Horner*, 854 F.2d 490 (D.C. Cir. 1988) .................. 19

*NTEU v. Von Raab*, 489 U.S. 656 (1989) .............................. 17

*NTEU v. Whipple*, 636 F. Supp. 2d 63 (D.D.C. 2009) ...... 20, 29

*OCONUS DOD Emp. Rotation Action Grp. v. Cohen*, 144 F. Supp.
2d 1 (D.D.C. 2000) .............................................................. 20

*Oklahoma v. Biden*, No. 21-cv-1136, 2021 WL 6126230
(W.D. Okla. Dec. 28, 2021) ................................................. 15

*Panama Ref. Co. v. Ryan*, 293 U.S. 388 (1935) ................... 43

*Rodden v. Fauci*, No. 3:21-CV-317, 2021 WL 5545234
(S.D. Tex. Nov. 27, 2021) .................................................... 15

*Rollins v. Marsh*, 937 F.2d 134 (5th Cir. 1991) ................... 19

*Rupcich v. United Food & Com. Workers Int'l Union*, 833 F.3d 847
(7th Cir. 2016) ..................................................................... 51

*Sambrano v. United Airlines, Inc.*, 19 F.4th 839 (5th Cir. 2021) .......... 58

*Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020) ................................... 44

*Sloan v. HUD*, 231 F.3d 10 (D.C. Cir. 2000) ............................................ 48

*Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159 (2001) ...................................................................................................... 41

*Texas v. Becerra*, No. 2:21-CV-229, ___ F. Supp. 3d ___, 2021 WL 5964687 (N.D. Tex. Dec. 16, 2021) .............................. 50, 51

*Texas v. Biden*, 20 F.4th 928 (5th Cir. 2021) ......................................... 55

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) ................. 23, 25, 64

*Topletz v. Skinner*, 7 F.4th 284 (5th Cir. 2021) ...................................... 13

*United States v. Fausto*, 484 U.S. 439 (1988) ......................................... 19

*U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548 (1973) ............................................................................. 37

*Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047 (5th Cir. 1997) ............. 57

*Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130 (5th Cir. 2021) ...................................................................................... 50

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) ........................ 2, 5

PUBLIC LAWS AND U.S. CODE

5 U.S.C. § 701 ............................................................................................ 7

5 U.S.C. § 2302 ........................................................................................ 25

5 U.S.C. § 3301 ........................................................................................ 32

5 U.S.C. § 3302 .............................................................................. 18, 32, 33

5 U.S.C. § 7301 ........................................................................................ 34

5 U.S.C. § 7513 ........................................................................................ 36

8 U.S.C. § 1182 ............................................................. 41

28 U.S.C. § 1292 ............................................................. 7

28 U.S.C. § 1331 ........................................................ 7, 23

28 U.S.C. §1346 ............................................................. 7

28 U.S.C. § 1361 ............................................................. 7

28 U.S.C. § 2201 ............................................................. 7

29 U.S.C. § 651 ............................................................. 35

40 U.S.C. § 101 ............................................................. 32

Civil Service Act of 1883, c. 27, 22 Stat. 403 ........................................ 37

Hatch Act, Pub. L. No. 76-252, 53 Stat. 1147 (1939)............................. 37

**REGULATORY MATERIALS AND EXECUTIVE ORDERS**

Executive Order 10096............................................................ 36

Executive Order 11491............................................................ 36

Executive Order 12674............................................................ 36

Executive Order 14043........................................................... 9, 35

15 Fed. Reg. 389 (Jan. 25, 1950) ........................................... 36

34 Fed. Reg. 17,605 (Oct. 31, 1969) ....................................... 36

54 Fed. Reg. 15,159 (Apr. 14, 1989) ....................................... 37

62 Fed. Reg. 43,451 (Aug. 9, 1997)......................................... 35

77 Fed. Reg. 24,339 (Apr. 18, 2012) ....................................... 35

86 Fed. Reg. 50,989 (Sept. 9, 2021) .................................. 9, 47, 49

86 Fed. Reg. 61,402 (Nov. 5, 2021) ............................................. 51, 52, 53

**Miscellaneous**

Alex Gangitano & Morgan Chalfant, *Federal Agencies Prepare to Act Against Unvaccinated Employees*, The Hill, https://thehill.com/homenews/administration/588836-federal-agencies-prepare-to-act-against-unvaccinated-employees (Jan. 9, 2022) ....................................................................................... 58, 61

Department of State circular of March 20, 1841, *reprinted in* U.S. Civil Serv. Comm'n, *History of the Federal Civil Service: 1789 to the Present* (1941) .............................................................. 37

Noah Higgins-Dunn, *Dr. Fauci Warns the U.S. Will See a 'Surge Upon a Surge' of Covid Cases Following the Holidays*, CNBC (Dec. 1, 2020), https://www.cnbc.com/2020/12/01/dr-fauci-warns-the-us-will-see-a-surge-upon-a-surge-of-covid-cases-following-the-holidays.html. ................................................................. 62

Eric Katz*, Some Agencies Report 100% Vaccine Mandate Compliance As Others Begin Suspensions,* Gov. Exec*.*, https://www.govexec.com/workforce/2022/01/some-agencies-report-100-vaccine-mandate-compliance-others-begin-suspensions/360630/ (Jan. 11, 2022) .................................. 61

*Press Briefing,* White House (Jan. 21, 2022), https://www.whitehouse.gov/briefing-room/press-briefings/2022/01/21/press-briefing-by-press-secretary-jen-psaki-january-21-2022/ ............................................................................... 61

*COVID-19 Cases and Hospitalizations by COVID-19 Vaccination Status and Previous COVID-19 Diagnosis — California and New York, May–November 2021*, https://tinyurl.com/2p8t6j99 ......... 52

Task Force, *COVID-19 Workplace Safety: Agency Model Safety Principles* (Sept. 13, 2021) ................................................... 9

Task Force, *FAQ* ................................................................... 9

THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (1969)..................................................................................34

WEBSTER'S AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1838) ...................................................................................34

**INTRODUCTION**

The District Court did not abuse its discretion by enjoining enforcement of the President's unilateral and unprecedented executive order requiring millions of federal employees to undergo a permanent and irreversible medical procedure to keep their jobs ("the Mandate" or "EO14043").

As the District Court held, "this case is not about whether folks should get vaccinated against COVID-19," nor is it about "the federal government's power, exercised properly, to mandate vaccination of its employees." ROA.1751. Indeed, employees remain free to get vaccinated voluntarily. Rather, this case is about "whether the President can, with the stroke of a pen and without the input of Congress, require millions of federal employees to undergo a medical procedure as a condition of their employment." ROA.1752. "That, under the current state of the law as just recently expressed by the Supreme Court, is a bridge too far." ROA.1752.

Thus, the "question before us is not how to respond to the pandemic, but who holds the power to do so." *NFIB v. Dep't of Labor*, 142 S. Ct. 661, 670 (2022) (Gorsuch, J., concurring). It is therefore this Court's constitutional responsibility to determine "who decides" whether to

impose a vaccine mandate on the entire federal workforce: is it Congress acting through bicameralism and presentment, or is it the President acting unilaterally? Under the current law as established by the Supreme Court, Congress—not the President with "a stroke of a pen"—is empowered to make such a momentous decision. Whether Congress has actually given the President that power is a prototypical "question for the courts." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 473 (2001). But Congress did not authorize the Mandate, which is therefore ultra vires.

The government portrays the District Judge as overly eager to grant an injunction. But the very same Judge previously *denied* a motion for a preliminary injunction against the Mandate in a different case and carefully weighed the relevant considerations here before reaching a decision. The government also invokes the fact that other judges have denied preliminary relief, but those cases featured basic foot-faults like suing the wrong defendants. The District Court here is the first to carefully analyze the key issues raised by the Mandate.

The President is not the CEO of a private company. His powers, like those of the entire federal government, are limited and enumerated. He has not been empowered to mandate permanent and irreversible medical

procedures for every civilian employee. In the Civil Service Reform Act ("CSRA"), Congress authorized the President to issue rules regarding employees' "conduct" in "the executive branch," but requiring a permanent and irreversible medical procedure is not regulating conduct at all, rather it is regulating *status* and public health.

Moreover, as the District Court correctly held, even if the Mandate were regulating conduct, the President's power stretches only to workplace conduct, and—as the Supreme Court just held in *NFIB v. Department of Labor*—mandating that every employee be permanently vaccinated is not a regulation of the workplace. "This is no everyday exercise of federal power. It is instead a significant encroachment into the lives—and health—of a vast number of employees." 142 S. Ct. at 665 (cleaned up). The Mandate is not regulation of federal employees *qua* employees, rather it is a general health and safety measure, issued without clear authority from Congress. The government is therefore wrong to assert that the Mandate has only "incidental effect on, or connection to, off-duty conduct." Gov.Br.34.

Even if there were some ambiguity about the President's power to regulate "conduct," several clear-statement canons confirm that the

President lacks the unusual power of broadly mandating vaccines—an act the Supreme Court has already held is subject to the major-questions doctrine, and which this Court has held is a traditional State function—absent clear authority from Congress. In other statutes, Congress has provided clear authority to impose vaccine mandates for certain individuals. But no such clear authorization exists for federal civilian employees.

The weakness of the government's argument is confirmed by the fact that it has been unable to cite any prior example in the Nation's nearly 250-year history where a President ordered civilian employees to undergo a medical procedure of any kind, let alone a permanent and irreversible procedure mandated for *every* civilian employee. "This lack of historical precedent, coupled with the breadth of authority that the [President] now claims, is a telling indication that the mandate extends beyond the [executive branch's] legitimate reach" and would require clear authorization from Congress. *NFIB*, 142 S. Ct. at 666 (internal quotation marks omitted).

The government's back-up argument is that the President has *inherent* Article II power to mandate permanent and irreversible medical

procedures for all federal employees. But the government never claims the CSRA is unconstitutional, meaning the government cannot invoke inherent Article II power over line-level federal civilian employees outside the bounds of that statute. The government's interpretation would render superfluous the many statutory provisions carefully defining the President's control over the civil service. In addition, Plaintiffs are employees, not Officers of the United States who serve at the pleasure of the President, and vaccination status certainly does not interfere with the President's ability to direct the execution of federal laws.

The government has never disputed that if its interpretation were adopted, the President could dictate even the minutiae of private life and require permanent and irreversible procedures—so long as it could be labeled "conduct." As the Sixth Circuit held, there is no "logical stopping point" to the government's theory, which would amount to "a *de facto* police power [of] the President." *Kentucky v. Biden*, 23 F.4th 585, 608 (6th Cir. 2022). The government claims to have found the largest of elephants in the smallest of mouseholes. *Whitman*, 531 U.S. at 468.

It is thus unsurprising that the government seeks to avoid this Court's consideration of the merits by claiming that review is precluded by the CSRA, which funnels individual challenges to past employment actions through an administrative scheme. The government claims the CSRA applies to Plaintiffs' facial, pre-enforcement challenges to an executive order, even though Plaintiffs expressly disclaim any individual employment claims and do not seek any employment relief like backpay or reinstatement. Numerous decisions, including ones binding this Court, over the last forty years have rejected the government's theory. There is no merit to the government's claim that these cases were silently overruled by the Supreme Court's decision in *Elgin v. Treasury*, 567 U.S. 1 (2012), which featured vastly different claims. Anyway, the government's theory that *Elgin* effected a sea change in preclusion is foreclosed by this Court's recent *en banc* decision holding that *Elgin* "did not break new ground." *Cochran v. SEC*, 20 F.4th 194, 206 (5th Cir. 2021) (*en banc*).

The District Court also properly found—in a decision reviewed only for abuse of discretion—that Plaintiffs had demonstrated imminent and irreparable injury under this Court's precedents, which hold that putting

employees to the unique Hobson's choice of "their job(s) or their jab(s)" is an irreparable harm.

As for the scope of the injunction, the District Court concluded that this case presents unique facts that warrant broad relief. In particular, lead Plaintiff Feds for Medical Freedom ("F4MF") is a membership association with over 6,000 members and growing—including 1,500 who have contributed financially to the group and nearly 1,000 who have contributed to this specific litigation (averaging over $300 per person). Those members work in every single State and for nearly every agency. Only a clear rule would suffice to ensure that all of those members receive the relief to which they are entitled. That reality is confirmed by the government's constant bungling during this case, including repeatedly breaking promises not to target certain members and reversing course as to whether employees would be suspended or fired.

For all these reasons, and as further explained in the District Court's order, Plaintiffs' motion briefing, and the briefing below, this Court should affirm the District Court's injunction, under which federal employees remain free to get vaccinated voluntarily.

## STATEMENT OF JURISDICTION

The District Court had jurisdiction under 5 U.S.C. §§ 701–706, and 28 U.S.C. §§ 1331, 1346, 1361, 2201, under the United States Constitution, and pursuant to the Court's equitable powers. The district court entered a preliminary injunction on January 21, 2022, and this Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

(1) Whether the District Court correctly rejected the government's theory that the Civil Service Reform Act strips district courts of jurisdiction over facial, pre-enforcement challenges that seek no employment relief and do not challenge individualized employment actions.

(2) Whether the District Court correctly held that the President's unprecedented and unilateral act of mandating that millions of civilian employees undergo a permanent and irreversible medical procedure to keep their jobs was unsupported by statutory and constitutional authority.

(3)     Whether the District Court abused its discretion by following this Court's precedents in finding that Plaintiffs demonstrated irreparable and imminent injury.

(4)     Whether the District Court abused its discretion by finding that the unique facts of this case warrant broad injunctive relief.

## STATEMENT OF THE CASE

### I.     FACTUAL BACKGROUND.

On September 9, 2021, President Biden issued Executive Order 14043, which states that "it is necessary to require COVID-19 vaccination for all Federal employees, subject to such exceptions as required by law." 86 Fed. Reg. 50,989 (Sept. 9, 2021). On September 13, 2021, the Safer Federal Workforce Task Force ("Task Force") issued a guidance document, recommending a deadline of November 22, 2021, for all federal employees to be fully vaccinated. Task Force, *COVID-19 Workplace Safety: Agency Model Safety Principles* 2 (Sept. 13, 2021), ROA.788.

In a subsequent "FAQ," the Task Force stated that "[e]mployees who are on maximum telework or working remotely are not excused from this requirement," nor are employees with natural antibodies. ROA.799. It continued that employees who fail to comply by November 22, 2021,

"are in violation of a lawful order" and subject to discipline, "up to and including termination or removal." ROA.810.

Defendant agencies acknowledge they have adopted policies requiring vaccines pursuant to EO14043. *See* ROA.1560–94.

## II. DISTRICT COURT PROCEEDINGS.

Lead Plaintiff F4MF has over 6,000 registered members, who respectively work in every State and for almost every federal agency. ROA.1193. Many are federal employees with no pending Mandate exemption requests and who have already been threatened with imminent discipline unless they give in and get vaccinated against their will. *See, e.g.*, ROA.1195; ROA.1204; ROA.1206; ROA.1212; ROA.1216; ROA.1229; ROA.1232; ROA.1242; ROA.1244; ROA.1486; ROA.1493; ROA.1745. Over 1,500 F4MF members have contributed financially to the organization, including nearly 1,000 members who contributed financially to this litigation (averaging over $300 per person). Pls.Addend.1.[1] Plaintiff Local 918 is also a membership group representing certain DHS employees. ROA.74.

---

[1] This affidavit was included in the Addendum to Plaintiffs' Opposition to Emergency Motion for Stay Pending Appeal in this Court.

Plaintiffs filed suit on December 21, 2021, and moved for a preliminary injunction the next day, arguing the Mandate is ultra vires and that Defendants' implementation of the Mandate is arbitrary and capricious under the Administrative Procedure Act. Plaintiffs repeatedly and expressly stated that they "do not challenge any individual employment decision in this suit" and do not seek employment relief. ROA.75; ROA.76; ROA.118; ROA.138.

On January 21, 2021, the District Court enjoined enforcement and implementation of EO14043 because it is ultra vires. ROA.1751. The government filed its appeal the same day (indicating it had received pre-approval from the Solicitor General) but then inexplicably waited a week before asking the District Court to stay its injunction, ROA.1780, then waited another week before asking this Court for a stay, which a motions panel carried with the case.

## SUMMARY OF THE ARGUMENT

The Court should affirm the District Court's well-reasoned order issuing a preliminary injunction against the unprecedented Mandate, which requires millions of federal employees to undergo an unwanted medical procedure to keep their jobs.

Decades of precedent have allowed facial, pre-enforcement challenges like those brought here. Those decisions remain binding. No court has adopted the government's theory that *Elgin* silently overruled those precedents and effected a sea change in the jurisdiction of federal courts over these cases, and indeed this Court's recent *en banc* decision in Cochran held that *Elgin* broke no new ground. And even if the Court reviewed the preclusion matter afresh, the result is the same.

On the merits, the government forfeited most of its arguments by not raising them in opposition to the motion for preliminary relief. The government should not be allowed to sandbag this litigation and raise new arguments now, especially after asking for emergency relief that requires expedited briefing.

In any event, the forfeited arguments and the few preserved arguments are all unpersuasive. The government's case turns on whether the President's power to regulate employees' "conduct," buried in the middle of a statute about mundane employment matters, gave him the power to control every aspect of federal employees' lives, including forcing them to undergo permanent and irreversible medical procedures. No President has ever invoked anything remotely close to such a claim—

which itself is telling. And the government's theory that the President has inherent Article II power to fire any employee he wants is foreclosed by binding Supreme Court precedent on the validity of the CSRA, which the government does not challenge.

Nor did the District Court abuse its discretion in finding that Plaintiffs would suffer imminent and irreparable harm absent relief, as this Court has held that facing the Hobson's choice of being unwillingly vaccinated or fired is irreparable. This Court has also held that reputational harms and loss of employment can be irreparable in circumstances far less compelling than those here.

Finally, the District Court did not abuse its discretion by awarding broad relief, as Plaintiff F4MF alone has over 6,000 members, spread across every State and nearly every federal agency. When coupled with the government's repeated inability to track employees during this litigation, the District Court correctly concluded that only a clear, broad injunction would provide relief to all members of F4MF.

## STANDARD OF REVIEW

"This court reviews the grant or denial of a preliminary injunction for abuse of discretion, with any underlying legal determinations

reviewed de novo and factual findings for clear error." *Topletz v. Skinner*,

7 F.4th 284, 293 (5th Cir. 2021).

## ARGUMENT

### I. THE DISTRICT COURT CORRECTLY HELD THAT THE PRESIDENT LACKS AUTHORITY TO ISSUE THE MANDATE.

As demonstrated below, the District Court correctly concluded that it could hear the challenge in this case and that the President lacks the authority to compel all federal civilian employees to undergo a permanent and irreversible medical procedure.

At the outset, Plaintiffs address the government's repeated reliance on the bare fact that other district courts denied preliminary relief against the Mandate. Gov.Br.1, 15, 18, 51. The government's attempt to paint the District Court as overly eager to grant relief here is unsupported and misleading given that the same District Judge had previously *denied* a motion for a preliminary injunction against the same Mandate in a different case. ROA.1754. Moreover, as the District Court explained in its Order, the government's reliance on other decisions denying relief is unpersuasive because those cases suffered from obvious

flaws not present here: those other plaintiffs sued the wrong defendants,[2] sued over the wrong policies,[3] or filed prematurely and thus provided no evidence that they truly faced a Hobson's choice between unwilling vaccination and being fired/suspended.[4] ROA.1754. Those defective cases are hardly persuasive compared to the District Court's exhaustive consideration here.

### A. THE GOVERNMENT'S CSRA THEORY IS PRECLUDED BY FORTY YEARS OF PRECEDENT.

The Complaint in this case states repeatedly that "Plaintiffs do *not* challenge any individual employment decisions," nor do Plaintiffs seek employment-related relief like reinstatement or backpay. ROA.75; ROA.76; ROA.118; ROA.138. Rather, Plaintiffs make a facial, pre-emptive challenge to an ultra vires executive order that puts federal

---

[2] *See, e.g.*, *Foley v. Biden*, No. 4:-21-cv-1098 (N.D. Tex. Oct. 6, 2021), ECF No. 18; *McCray v. Biden*, No. 1:21-cv-2882, 2021 WL 5823801 (D.D.C. Dec. 7, 2021); *Rodden v. Fauci*, No. 3:21-CV-317, 2021 WL 5545234 (S.D. Tex. Nov. 27, 2021).

[3] *See, e.g.*, *Oklahoma v. Biden*, No. 21-cv-1136, 2021 WL 6126230 (W.D. Okla. Dec. 28, 2021).

[4] *See, e.g.*, *AFGE v. Biden*, No. 1:21-cv-23828 (S.D. Fla. Dec. 22, 2021), ECF No. 33; *Altschuld v. Raimondo*, No. 1:21-cv-2779, 2021 WL 6113563 (D.D.C. Nov. 8, 2021); *Church v. Biden*, No. 1:21-cv-2815, 2021 WL 5179215 (D.D.C. Nov. 8, 2021)

civilian employees to the "Hobson's choice" between "their job(s) and their jab(s)." *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021). Despite this, the government raises and attacks a strawman argument, insisting the CSRA precludes all review here, even though that statute applies only to individual employment disputes seeking typical employment relief like backpay or reinstatement.

The government's theory is foreclosed by decades of still-binding precedent, and even if the Court engaged in a *de novo* preclusion analysis, the result would be the same. The District Court correctly held that it had jurisdiction.

### 1. Binding Precedent Holds that the CSRA Does Not Preclude Plaintiffs' Claims.

For at least four decades, courts—including this one—have consistently held that district courts are a proper forum for pre-enforcement facial challenges to regulations and executive orders, even when they involve employment in some way.

For example, in a case involving a "government-wide regulation promulgated by the Office of Personnel Management," this Court cited the D.C. Circuit's decision in *NTEU v. Devine*, 733 F.2d 114 (D.C. Cir. 1984)—discussed below—and held that if a plaintiff "wishes to challenge

16

the validity of this [federal employment] regulation, there are other means available," such as "challenging [the] regulations in district court." *AFGE v. FLRA*, 794 F.2d 1013, 1015–16 (5th Cir. 1986). Plaintiffs followed that holding, which remains binding and resolves this issue.

Further, when a union of federal employees challenged President Reagan's executive order requiring drug testing of certain employees (an order the government cites elsewhere for support, Gov.Br.35), first in district court and then on appeal, this Court addressed the merits of the claims and further authorized suits "against the individual agency plans implementing the [Executive] Order," with nary a word about CSRA preclusion. *NTEU v. Bush*, 891 F.2d 99, 102 (5th Cir. 1989). The Supreme Court itself then considered the merits of a suit involving President Reagan's executive order—again without a word about CSRA preclusion—in *NTEU v. Von Raab*, 489 U.S. 656 (1989).

The D.C. Circuit has also long held in this context that there is "no legal basis" to argue that courts lack jurisdiction due to "the exclusive jurisdictional provisions of the Civil Service Reform Act." *NFFE v. Weinberger*, 818 F.2d 935, 939–40 (D.C. Cir. 1987). In fact, the D.C. Circuit, per authoring Judge Harry Edwards, forewarned the

government: "To discourage any future litigant who might have the effrontery to engage the District Court with this discredited theory of subject matter jurisdiction, we briefly review the law of this circuit for what we trust will be the last time," and the court held that constitutional and APA challenges had been properly brought. *Id.* at 940, 941 n.11. The court also rejected the theory that "exhaustion of administrative remedies" was required (contrary to the government's argument here). *Id.* at 940. In sum, "the District Court's federal question jurisdiction extends to the subject matter of this dispute, and … the court has the power to grant the equitable relief requested," *i.e.*, a preliminary injunction. *Id.* at 941–42.

In another case that invalidated a new employment regulation issued pursuant to 5 U.S.C. § 3302—one of the same statutes invoked here—the D.C. Circuit held that while judicial review of "minor personnel actions" is barred by CSRA, the court was instead "confronted with a major policy decision" that affects "thousands of government employees"—a number that pales in comparison to the Mandate—and thus was not within the CSRA. *NTEU v. Horner*, 854 F.2d 490, 497 (D.C. Cir. 1988) (D.H. Ginsburg, J.).

And another decision—written by Judge Edwards and joined by Judges Bork and Scalia—emphatically rejected as "meritless" the idea that the CSRA "impliedly precludes preenforcement judicial review of rules" imposing "dramatic changes in federal personnel practices relating to reduction in force procedures, performance management systems, and pay administration." *Devine*, 733 F.2d at 115, 117 n.8.

The government claims *every single one* of these Fifth and D.C. Circuit cases is wrong. But it proffers only the thinnest of reeds. The government cites stray language from cases that are easily distinguishable, involving challenges to previous discipline in *individualized* employment actions where employees sought *standard employment relief* like reinstatement or damages.[5]

---

[5] *See United States v. Fausto*, 484 U.S. 439, 441 (1988) (employee sought "backpay" after being suspended); *Greiner v. United States*, 900 F.3d 700, 702 (5th Cir. 2018) (employee sought "damage[s]" for termination resulting from his redundancy); *Gonzalez v. Manjarrez*, 558 F. App'x 350, 353 (5th Cir. 2014) (employee "seeking damages" for termination); *Rollins v. Marsh*, 937 F.2d 134, 136 (5th Cir. 1991) (two employees sought "damages" after being disciplined for publishing nude photos); *Garcia v. United States*, 680 F.2d 29, 31–32 (5th Cir. 1982) (employee sought "reinstatement and back pay" after being discharged for violating work rules); *Broadway v. Block*, 694 F.2d 979, 980 (5th Cir. 1982) (reassigned employee "request[ed] reinstatement of her former position and damages of $15,000"); *McAuliffe v. McGovern*, No. CIV. SA-89-CA-0028, 1991 WL

(*footnote continued on next page*)

As one court stated in rejecting the government's view: "Unlike what plaintiffs claimed in [the cases cited by the government], [plaintiff] does not challenge any personnel decisions or benefits determinations made in individual cases, and instead asserts that the OPM's promulgation of the [employment] regulation was arbitrary and an abuse of discretion in violation of 5 U.S.C. § 3302 and § 3304…. [Plaintiff's] requested relief would prohibit further use of the [employment] regulation, but does not seek individual relief for specific employee claims. The CSRA does not preclude this type of rulemaking challenge under the APA." *NTEU v. Whipple*, 636 F. Supp. 2d 63, 69 (D.D.C. 2009).[6]

The government next suggests that the Supreme Court' 2012 *Elgin* decision must have silently overruled the longstanding and on-point

---

352482, at *1 (W.D. Tex. July 23, 1991) (employee terminated for failing job requirements sought "reinstate[ment]"), *aff'd sub nom. McAuliffe v. Rice*, 966 F.2d 979 (5th Cir. 1992); *Fornaro v. James*, 416 F.3d 63 (D.C. Cir. 2005) (individualized employment challenges seeking employment relief).

[6] Indeed, courts have held that APA claims are especially unlikely to be precluded in this context. *See, e.g., FLEOA v. Rigas*, No. 1:19-cv-735, 2020 WL 4903843, at *3–4 (D.D.C. Aug. 20, 2020); *FLEOA v. Cabaniss*, No. 1:19-cv-735, 2019 WL 5697168, at *4–6 (D.D.C. Nov. 4, 2019); *OCONUS DOD Emp. Rotation Action Grp. v. Cohen*, 144 F. Supp. 2d 1, 6–8 (D.D.C. 2000).

Fifth and D.C. Circuit cases allowing claims like Plaintiffs'. Gov.Br.23–24 (arguing those cases "pre-date *Elgin*"). But the argument that *Elgin* effected a sea change is foreclosed by this Court's recent *en banc* decision holding that *Elgin* "did not break new ground" in the area of preclusion. *Cochran*, 20 F.4th at 206. That is because *Elgin*—just like the government's other cases—involved individualized "challenges [to] an adverse employment action," which the employees sought "to reverse" and "to receive the compensation they would have earned." 567 U.S. at 5, 22. *Elgin* was explicit that "the better interpretation of the CSRA is that its exclusivity does not turn on the constitutional nature of an employee's claim, but rather on the type of the employee *and the challenged employment action*." *Id.* at 15 (emphasis added). *Elgin* simply held that when an employee challenges an individual, prior employment action and seeks to be reinstated or receive backpay, the CSRA precludes district court jurisdiction even if the employee makes constitutional claims. *Id.* at 15.

Despite the government's contrary claim, Gov.Br.24–25, no court has held that *Elgin* overruled prior cases involving pre-enforcement facial challenges. But courts have *rejected* that view. For example: "[T]he

plaintiffs in *Elgin* were challenging a discrete employment decision rather than any [employment] rulemaking. As such, *Elgin* is not relevant to the Court's present analysis." *Cabaniss*, 2019 WL 5697168, at *6 (distinguishing the same cases the government proffers to this Court, including *AFGE v. Sec'y of the Air Force*, 716 F.3d 633 (D.C. Cir. 2013), and *AFGE v. Trump*, 929 F.3d 748 (D.C. Cir. 2019)).[7]

Critically, even if the Court believed there were tension between *Elgin* and this Court's 1980s precedents allowing claims like Plaintiffs', this Court's precedents would remain binding: "For a Supreme Court decision to override a Fifth Circuit case, the decision must unequivocally overrule prior precedent." *Gahagan v. USCIS*, 911 F.3d 298, 302 (5th Cir. 2018). Not even the government claims that high threshold is satisfied.

---

[7] For example, *AFGE*, 929 F.3d 748, "contains no mention of prior D.C. Circuit cases expressly permitting pre-enforcement review of [agency] rulemaking," *Cabaniss*, 2019 WL 5697168, at *6, indicating it did not negate that long-established line of precedent. *AFGE* is thus inapplicable here. In fact, applying the same analysis used in *AFGE*—the *Thunder Basin* factors, discussed below—reinforces that district court review is proper in this case.

## 2. Conducting the Preclusion Analysis Anew Yields the Same Result.

The cases above demonstrate that Plaintiffs' claims were properly filed in district court. The government has never disputed that the so-called *Thunder Basin* factors—for determining statutory preclusion afresh—would favor Plaintiffs. If the Court concluded that its precedent were no longer binding, the Court could still affirm on the alternative basis that there is no preclusion under the *Thunder Basin* factors.

As this Court's recent *en banc* decision in *Cochran* held, there is a "'strong presumption favoring judicial review'" in the district courts, which "the Government may rebut only by carrying the 'heavy burden' of showing that the statute's 'language or structure' forecloses judicial review." 20 F.4th at 200. This strong presumption derives from 28 U.S.C. § 1331, which provides district courts with jurisdiction over "all" federal question suits. "Not some or most—but all." *Cochran*, 20 F.4th at 199.

Accordingly, this Court "will … find an intent to preclude such review only if presented with 'clear and convincing evidence.'" *Texas v. United States*, 809 F.3d 134, 163 (5th Cir. 2015).

To do so, the government must convincingly satisfy the *Thunder Basin* factors (which, again, the government never raised below).

*Cochran*, 20 F.4th at 202. *First*, the Court considers "whether Congress's intent to preclude district court jurisdiction [is] 'fairly discernible in the statutory scheme,'" and if not, there is no preclusion. *Second*, even if the claim may be within the statutory scheme, there still is no preclusion where "meaningful review" would otherwise be unavailable, which requires the Court to "consider[] three factors: (1) whether 'a finding of preclusion could foreclose all meaningful judicial review'; (2) whether the claims were 'wholly collateral' to a statute's review provisions; and (3) whether the claims were 'outside the agency's expertise.'" *Id.* at 205. These factors all favor Plaintiffs.

**Preclusion Is Not Fairly Discernible.** In *Cochran*, this Court offered this simple test: "*Elgin* suggests that whether a claim is collateral to the relevant statutory-review scheme depends on whether that scheme is intended to provide the sort of relief sought by the plaintiff" in his lawsuit. *Id.* at 207.

As the District Court correctly held, the CSRA applies to claims challenging prior, individualized "actual discipline" and seeking employment relief like reinstatement and backpay. ROA.1756; 5 U.S.C. § 7512. But Plaintiffs' claims here do not challenge individualized

"covered adverse employment action[s]," *Elgin*, 567 U.S. at 20, let alone past actions or employment discipline. Nor do they seek "to reverse [any] removal decisions" or "receive the compensation they would have earned." *Id.* at 22. In fact, Plaintiffs expressly disclaim it: "Again, to be clear, Plaintiffs do not challenge any individual employment decision in this suit." ROA.118. And in discussions with the undersigned, government counsel has agreed that the preliminary injunction here does *not* require any relief to any employees who may have been disciplined before the injunction issued. This results from the fact that Plaintiffs are simply not bringing covered employment claims nor seeking employment relief, and thus are not fairly within the CSRA's strictures. ROA.1755; ROA.1756.

Even if the matter were debatable, that only confirms the government has not provided "'clear and convincing evidence'" of preclusion. *Texas*, 809 F.3d at 163. That resolves the matter in Plaintiffs' favor.[8]

---

[8] The government suggests in passing that employees "could potentially" appeal immediately to the Office of Special Counsel ("OSC") on the theory that the Mandate itself "could" be a "significant change in … working conditions," or that receiving a "letter of reprimand" "could" be a

*(footnote continued on next page)*

But even if the Court disagrees, it would merely continue to the second *Thunder Basin* factor, which also favors Plaintiffs.

**There Could Be No Meaningful Review.** As noted above, there are three relevant considerations regarding meaningful review. *Cochran*, 20 F.4th at 205.

*First*, a finding of preclusion "could foreclose all meaningful judicial review" for the vast majority of affected employees. *Id.* The test is not whether meaningful review *must* be foreclosed or even *likely* would be foreclosed—but simply whether it "*could*," meaning whether it "threatens to deprive [plaintiffs] of the opportunity" to raise challenges. *Id.* at 199.

---

"disciplinary … action." 5 U.S.C. § 2302(a)(2)(A)(iii), (xii); Gov.Br.24. But those statutory provisions do not provide a free-standing right to challenge working conditions or reprimands. Rather, they must have resulted from an enumerated list of actions like whistleblowing, illegal discrimination, nepotism, or coercing political activity—none of which seem to apply here. 5 U.S.C. § 2302(b). That § 2302 does not preclude review here is confirmed by this Court's *NTEU* decision, which addressed the merits of President Reagan's drug-testing order even though the plaintiffs argued the order violated § 2302. 891 F.2d at 101–02. In any event, the District Court correctly concluded that merely announcing the Mandate was not a significant change in working conditions, ROA.1755-56; *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 367 (D.D.C. 2020), and the government has claimed elsewhere that written warnings are not disciplinary action or subject to grievance, *see* ROA.1197; ROA.1234; ROA.1256.

"Plaintiffs are denied meaningful review when they are subject to some additional and irremediable harm beyond the burdens associated with the dispute resolutions process," *Berkley v. Mountain Valley Pipeline, LLC*, 896 F.3d 624, 631 (4th Cir. 2018), and this Court already held in *BST* that the choice between employees' "job(s) and their jab(s)" is one such "additional and irreparable" injury because of the overwhelming pressure placed on employees to submit immediately to a permanent and irreversible medical procedure. 17 F.4th at 618. This means a subsequent "administrative review process is insufficient to afford [employees] full relief." *Kreschollek v. S. Stevedoring Co.*, 78 F.3d 868, 875 (3d Cir. 1996).

Indeed, no one can dispute that any employee coerced into getting vaccinated to save their job (which is precisely the point of the Mandate) will never receive any discipline that could be challenged through the CSRA, and the government will have imposed a permanent and irreversible medical procedure via an *in terrorem* campaign. This process is still ongoing: every day, more employees feel compelled to get vaccinated against their wishes, but as soon as they give in, they forgo the ability to bring a CSRA claim. ROA.82; ROA.83.

As in *Cochran*, those employees are harmed by an illegal process that puts them to his "Hobson's choice," and that harm cannot be remedied later. Neither the Merit Systems Protection Board ("MSPB") nor the Federal Circuit can reverse a vaccination. This is especially true given that such employees are "not guaranteed an adverse final order" of discipline that they could pursue through the CSRA—in fact they are guaranteed *not* to receive any such order. *Cochran*, 20 F.4th at 203.

And in the same bucket are all the people whom the government has or will coerce into accepting demotions as "accommodations" for religious and medical claims—people who will have no recourse because they allegedly consented. This includes members of F4MF. ROA.1817.[9]

"To be sure, it is possible that [a Plaintiff] could ultimately wind her way through enforcement proceedings and get some later chance at judicial review—but it is also possible that she could never have that opportunity, *and that is enough to preserve district court jurisdiction*."

---

[9] Even among employees who are ultimately disciplined, the government claims the MSPB "might resolve [their] case[s] in [their] favor," *Cochran*, 20 F.4th at 203; Gov.Br.39, meaning they would have faced an illegal process but be unable to reach an Article III court.

*Cochran*, 20 F.4th at 210 (emphasis added). That is enough to resolve the *Thunder Basin* factors in favor of Plaintiffs.[10]

This Court has also rejected the government's false claim that authorizing such suits would open the floodgates to challenges: "doctrines, such as standing, ripeness, exhaustion, sovereign immunity, and abstention, may prevent district courts from hearing challenges to ongoing administrative enforcement proceedings." *Id.* at 211. And history proves it. Plaintiffs' rule has been adopted by circuit courts for forty years without the slightest hint of a "floodgates" problem.

*Second*, as Plaintiffs have stated repeatedly, they are bringing claims that do not challenge individual employment actions nor seek employment relief of any kind, and thus their claims are "'wholly collateral' to [the CSRA's] review provisions." *Id.* at 205. Declaring void an executive order that puts millions of employees to an illegal and impossible choice is hardly "relief that the CSRA routinely affords." *Elgin*, 567 U.S. at 22. And unlike in *Elgin*, this lawsuit is *not* "the vehicle by which plaintiffs seek to reverse [any] removal decisions." *Cochran*, 20 F.4th at 206. Any prior discipline pursuant to the Mandate is water

_____

[10] And notably the MSPB has now gone five years without a quorum.

under the bridge, not something sought to be reversed by this suit. To be sure, the "requested relief would prohibit further use of the [Mandate and its implementing] regulation[s], but [it] does not seek individual relief for specific employee claims. The CSRA does not preclude this type of rulemaking challenge." *Whipple*, 636 F. Supp. 2d at 69.

*Third*, Plaintiffs' claims are "'outside the agency's expertise'" because they present constitutional arguments and "'questions of administrative law, which the courts are at no disadvantage in answering.'" *Cochran*, 20 F.4th at 205, 207–08. In fact, this is the primary purpose of federal courts. *See id.*

If the government were correct, then no district court would have jurisdiction to review challenges even to the broadest, most patently unconstitutional executive orders involving federal employees. The President could order every federal employee to contribute half their salary for the next six months to his reelection campaign, or forgo having children for the next twelve months. No court has ever bought such an expansive view of the CSRA. This Court should not be the first.

**B.** **THE DISTRICT COURT CORRECTLY HELD THAT THE MANDATE IS ULTRA VIRES.**

The President lacks the power to unilaterally mandate permanent and irreversible medical procedures as a condition of federal employment. ROA.1761. There has long been authority for a plaintiff to "institute a non-statutory review action" against an agency head "for allegedly exceeding his statutory authority." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327–28 (D.C. Cir. 1996) (the APA "does not repeal the review of *ultra vires* actions," which pre-date the APA itself). "Even if the [agency head] were acting at the behest of the President, this does not leave the courts without power to review the legality of the action, for courts have power to compel subordinate executive officials to disobey illegal Presidential commands." *Id.* (alterations omitted).

As with the OSHA private-employee mandate, which this Court called a "work-around," *BST*, 17 F.4th at 612, the Mandate here was issued without clear legal authority and was properly enjoined.

### 1. The President Lacks Statutory Power to Issue the Mandate.

The District Court correctly held that none of the statutory sources invoked by the government provide the President with the power to issue

an indiscriminate vaccine mandate for millions of federal employees. ROA.1761. In its briefing on the preliminary injunction below, the government barely even defended this point, spending only a single page on the matter, and thus many of its arguments to this Court are new and should be deemed forfeited. ROA.1545.

The District Court correctly held that the first two invoked statutes—5 U.S.C. §§ 3301 and 3302—are narrowly focused, granting the President only certain limited powers not relevant here. ROA.1762.

In passing, the government claims without any support that § 3301's "authority to establish requirements for new federal employees logically includes the authority to modify requirements for existing employees." Gov.Br.37. Besides being forfeited, that argument is meritless because it ignores that Congress prescribed different authority governing entry into and management of the federal workforce, using different language in entirely separate chapters of Title 5.

The government next tries to portray the District Court as confused because it cited federal *contractor* mandate decisions when analyzing § 3301. Gov.Br.36. But the language in § 3301 ("promote the efficiency of [the civil] service") parallels the language in 40 U.S.C. § 101 ("an

economical and efficient system for" procurement), which is the statute the government claims authorizes the contractor mandate. The District Court aptly cited cases rejecting the claim that vaccines can be mandated on this "efficiency" basis. ROA.1762.

The government next argues that § 3302's "identification of specific matters the President must address does not impliedly prohibit the President from addressing other matters," Gov.Br.37, but this argument was not raised below and is forfeited. It is also meritless because the President's authority to "prescribe rules" must be interpreted in context of the entire statute, and the District Court properly concluded after reviewing the entirety of § 3302 that "not even a generous reading of the text provides authority for a vaccine mandate." ROA.1762; *see Adams v. Woods*, 6 U.S. (2 Cranch) 336, 341 (1805) ("[G]eneral expressions may be restrained by subsequent particular words, which shew that in the intention of the legislature, those general expressions are used in a particular sense[.]"). The government's view would also render the majority of § 3302 superfluous and would push the word "rules" past its breaking point by allegedly authorizing the President to commandeer every aspect of federal employees' lives.

Sections 3301 and 3302 also appear in a subchapter of Title 5 entitled "Examination, Certification, and Appointment," and in a chapter entitled "Examination, Selection, and Placement," which reaffirms these statutes do not extend to whether existing employees can keep their jobs. *See Yates v. United States*, 574 U.S. 528, 540 (2015) (headings "supply cues" to interpreting statutes).

The crux of the District Court's decision turned on whether requiring that all employees are vaccinated is "conduct" for purposes of the third invoked statute—5 U.S.C. § 7301—which states: "The President may prescribe regulations for the conduct of employees in the executive branch." But being vaccinated is not "conduct" in its commonly understood sense. *See* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (1969) ("[t]he way a person acts; behavior"); WEBSTER'S AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1838) ("personal behavior; course of actions; deportment" or "[m]anagement; mode of carrying on"). A permanent and irreversible measure results in a status, not the regulation of conduct. That alone resolves the matter.

The District Court correctly held that *even assuming* the Mandate regulates conduct, EO14043 is still ultra vires because § 7301 is best read

as authorizing regulation of *workplace* conduct, and "[a]ny broader reading would allow the President to prescribe, or proscribe, certain private behavior by civilian federal workers outside the context of their employment." ROA.1763. The government claims there is no textual limitation to employment conduct, Gov.Br.34, but the government forfeited that argument by not raising it in its opposition below. Anyway, the government is wrong. Section 7301 expressly references conduct for those "in the executive branch," indicating a limitation to conduct in employees' executive branch capacity.

It also beggars belief that the simple word "conduct" authorizes widespread vaccine mandates. *First*, setting aside whether § 3301 would authorize a vaccine mandate for *applicants*, its text—which specifically references "ascertain[ing] … health" for applicants—differs noticeably from § 7301's reference to regulating "conduct" of current employees. Congress knows how to authorize executive branch inquiries into individual health matters, but did not do so in § 7301. *Second*, even OSHA lacks such power despite an enabling statute authorizing the agency to ensure "every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § 651; *see NFIB*, 142 S. Ct. at

665–66. If a statute directly implicating employee health and safety doesn't authorize a vaccine mandate, then authority over employee "conduct" doesn't, either.

Moreover, implementation of §§ 3301, 3302, and 7301 has historically been limited to regulating conduct in an executive branch capacity, even when the targeted activity might occur outside the workplace. *See, e.g.*, 62 Fed. Reg. 43,451 (Aug. 9, 1997) (regulating "exposure to tobacco smoke *in the Federal workplace*"); 77 Fed. Reg. 24,339 (Apr. 18, 2012) ("prevent[ing] domestic violence *within the workplace*").

The government's invocation of President Reagan's executive order prohibiting illegal drug use is especially inapt given that (1) it did not involve a permanent, irreversible status like being vaccinated; (2) there is only a brief mention about using drugs outside the workplace; (3) it narrowly applied only to those employees with "sensitive positions," not to every federal employee; and (4) most critically, drug use was *already* illegal, and the CSRA provided that employees could be immediately disciplined when there was "reasonable cause to believe the employee has

committed a crime for which a sentence of imprisonment may be imposed," 5 U.S.C. §§ 7513(b)(1), 7543(b)(1).

The other executive orders cited by the government—which were not raised in its opposition below—involved the regulation of conduct in or with a unique relationship to the workplace, required employees to follow preexisting laws, or involved statutory authority in addition to § 7301. Executive Order 10096, for example, provided that the government shall take title to inventions by government employees during workplace hours, using government resources, or which otherwise arose from official duties. 15 Fed. Reg. 389, 389 (Jan. 25, 1950). And although Executive Order 11491 stated that internal union business should be conducted "during the non-duty hours of the employees concerned," it did nothing to mandate such out-of-work meetings, merely prohibiting the use of *working hours* for those purposes. 34 Fed. Reg. 17,605, 17,614 (Oct. 31, 1969). And Executive Order 12674 similarly prohibited conflicts of interest that arose *only because of* federal employment. 54 Fed. Reg. 15,159 (Apr. 14, 1989).[11]

---

[11] The government invokes the Department of State circular of March 20, 1841, prohibiting employees from "attempts to influence the minds or

(*footnote continued on next page*)

Again, none of these examples involved acts with permanent and irreversible consequences outside the workplace, let alone medical procedures. It is telling that these fragments of easily distinguishable executive orders are the best precedents the government can muster. A vaccine mandate with no unique significance to federal employment is without precedent and amounts to "regulat[ing] the hazards of everyday life." *NFIB*, 142 S. Ct. at 665.

The government pivots by claiming vaccine mandates do regulate workplace conduct, Gov.Br.34, but as the District Court ruled, that theory is foreclosed by the Supreme Court's recent *NFIB* decision, which held that broad employee vaccine mandates are "public health measure[s]" "untethered, in any causal sense, from the workplace," and

---

votes of others," but this example actually supports Plaintiffs. That circular predates the civil service altogether. Then, when Congress passed the Civil Service Act of 1883, c. 27, 22 Stat. 403, it placed express limits on the political activity of certain government employees and directly "authorized the President to promulgate rules to carry the Act into effect," *U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 558 (1973), justifying such prohibitions and providing the type of statutory authority conspicuously absent for vaccine mandates. Congress later expanded those prohibitions in the Hatch Act, Pub. L. No. 76-252, 53 Stat. 1147 (1939), confirming that Congress—not the President acting unilaterally—has long played the leading role in regulating employee conduct outside the workplace.

thus are not "*workplace* safety standards," 142 S. Ct. at 665, 666 (refusing to let OSHA "regulate the hazards of daily life" as occupational hazards "simply because most Americans have jobs and face those same risks while on the clock").

Even if the Supreme Court's opinion did not foreclose the government's argument, the Sixth Circuit's persuasive opinion about the contractor mandate explains why the government is wrong. All of the government's historical examples are "modest, 'work-anchored' measure[s] with an inbuilt limiting principle," but a vaccine mandate "requires vaccination everywhere and all the time"—"[i]t is not 'anchored' to the statutory text, nor is it even 'anchored' to the work of federal contractors." *Kentucky*, 23 F.4th at 608. The same is true for federal employees.

When a general employment requirement has permanent and irreversible consequences outside the workplace, it can no longer be considered the regulation of "workplace conduct." Rather, it is a general health and safety measure.

## 2.  Several Clear-Statement Doctrines Confirm the Lack of Statutory Authority.

Even if these statutes were ambiguous about the President's power to mandate medical procedures, several clear-statement doctrines confirm that the generic authority to issue "rules" and regulate "conduct" does *not* include the power to issue a broad vaccine mandate.

To begin, the Supreme Court has already recognized that the major-questions doctrine applies to widespread federal vaccine mandates, *see NFIB*, 142 S. Ct. at 665, which requires Congress to "speak[] clearly" when it delegates "powers of 'vast economic and political significance,'" *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021). The government will predictably claim that the Mandate does not involve questions of vast economic and political significance, but that falls flat because the government argued to the District Court that imposing the Mandate is important to protect the "millions" of federal employees and the critically important "aspects of the government's work," ROA.1555; ROA.1556. The government cannot have it both ways.

This Court has also made clear that "to mandate that a person receive a vaccine or undergo testing falls squarely within the States' police power," which implicates the federalism clear-statement canon.

*BST*, 17 F.4th at 617. This canon applies despite employees' federal nexus. By imposing a generally applicable vaccine mandate on federal employees, which carries permanent and irreversible non-workplace consequences, the government is not regulating federal employees *qua* employees but rather is imposing a general public-health measure. As the Sixth Circuit held in the context of the contractor mandate, the government is "fram[ing] the issue at the wrong level of generality," by focusing solely on the group targeted, not the action taken. *Kentucky*, 23 F.4th at 610. It "certainly" implicates the federalism clear-statement canon "when the federal government seeks to usurp [the States'] roles by doing something that *it* has no traditional prerogative to do—deploy [regulations] to mandate an irreversible medical procedure." *Id.*

A third clear-statement doctrine provides that "[w]here an administrative interpretation of a statute invokes the outer limits of Congress' power," Congress must provide "a clear indication that [it] intended that result." *Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172 (2001). This Court has held that broad vaccine mandates are at the outer limits of Congress's power. *BST*, 17 F.4th at 617.

Consistent with these clear-statement rules, when Congress authorizes mandatory vaccinations, it has done so expressly, including in areas where the President could claim inherent Article II power. *See* 8 U.S.C. § 1182(a)(1)(A)(ii) (mandating vaccines in immigration context). But Congress did not do so here.

The government has previously argued that these clear-statement doctrines apply only when the government invokes *Chevron* deference. ROA.1546. That is wrong. The Supreme Court has repeatedly applied the major-questions doctrine when the government did not seek *Chevron* deference. *NFIB*, 142 S. Ct. at 665; *Ala. Ass'n*, 141 S. Ct. at 2489. As Chief Judge Sutton (joined by seven of his colleagues) persuasively explained, "ambiguity for *Chevron* purposes comes at the end of the interpretation process, not at the beginning. The clear-statement canons eliminate any power-enhancing uncertainty in the meaning of the statute." *See In re MCP No. 165*, 20 F.4th 264, 280 (6th Cir. 2021) (Sutton, C.J., dissenting).

For the same reason, the Court should reject the government's argument—made only in passing below and thus forfeited—that the canons apply to agency action but not to exercises of "presidential … authority." ROA.1546. Agency actions always involve presidential

authority because those agencies are overseen by and report to the President.

If anything, canons like the major-questions doctrine apply *more* strongly when the President's actions are directly at issue. The major-questions doctrine "appl[ies] … in service of" the nondelegation doctrine, *Gundy v. United States*, 139 S. Ct. 2116, 2142 (2019) (Gorsuch, J., dissenting), which the Supreme Court has applied most stringently to authority delegated *directly* to the President, *see A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) (Congress authorized President directly to develop codes of conduct); *Panama Ref. Co. v. Ryan*, 293 U.S. 388 (1935) (Congress authorized President directly to prohibit transportation of certain oil). Given their common roots, it makes little sense to argue the major-questions doctrine does not apply to Presidential actions when the nondelegation doctrine so clearly does.

Finally, if Congress did give the Executive such dramatic power uncabined by statutory text, it would violate the nondelegation doctrine, *see Gundy*, 139 S. Ct. at 2134–37 (Gorsuch, J., dissenting), but the Supreme Court has held that courts should avoid such concerns by narrowly interpreting seemingly broad statutory text, *see Indus. Union*

*Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 646 (1980) (plurality); ROA.123.

### 3. The President Lacks Inherent Article II Power to Issue the Mandate.

The District Court also correctly held that the President lacks inherent Article II authority to issue the Mandate. ROA.1765; *cf. BST*, 17 F.4th at 618 ("Nor can the Article II executive breathe new power into OSHA's [statutory] authority.").

The government does not argue that the CSRA is unconstitutional, which forecloses reliance on inherent Article II power to circumvent the strictures of that statute. Congress carefully prescribed specific and varying authority governing entry into and management of the federal workforce, which would become superfluous if the President could simply invoke Article II to assume whatever additional power he desired. Anyway, conspicuously missing from the government's brief is any example of any President in the Nation's history who invoked inherent Article II authority to impose medical procedures of any type on civilian employees—let alone *every* employee. *Cf. In re MCP No. 165*, 20 F.4th at 289–91 (Sutton, C.J., dissenting). "The dearth of analogous historical examples is strong evidence that [the provision] does not contain such a

power," especially given that "the threat of absenteeism is hardly unique to COVID-19." *Kentucky*, 23 F.4th at 608.

The government vaguely argues that refusal by line-level employees to confirm their vaccinated status somehow interferes with the President's "executive power," but the District Court made short work of that theory. ROA.1765. Vaccination status in no way interferes with the President's ability to direct how the law should be executed. The government's invocation of *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020), Gov.Br.28, is inapplicable for two reasons. *First*, that case references the President's "administrative control" over certain officials, but mandating a permanent and irreversible medical procedure is hardly a mere "administrative" requirement. *Second*, Plaintiffs are line-level employees, not "Officers of the United States" who exercise significant authority and are personally accountable to the President.[12] The distinction between officers and employees dates back at least to the Supreme Court's seminal decision in *Myers v. United States*, 272 U.S. 52

---

[12] Even when it comes to Officers, the Supreme Court has held that the President does not have inherent Article II power to remove certain high-level executive branch officers, and that precedent remains binding as of now. *See Morrison v. Olson*, 487 U.S. 654, 686 (1988).

(1926), which held that while the President had constitutional power to "remov[e] executive officers of the United States whom he has appointed by and with the advice and consent of the Senate," *id.* at 106, by contrast "the merit system rests with Congress," *id.* at 174. Unless the Supreme Court revisits that conclusion, the CSRA limits whatever inherent authority the President might otherwise have, and this Court can assume without deciding that the CSRA is constitutional because the government never contends otherwise.

As Chief Judge Sutton reminded us, if the government's argument were accepted, it would "come[] with easy-to-overlook risks." *In re MCP No. 165*, 20 F.4th at 273–74 (Sutton, C.J. dissenting). Indeed, despite having many opportunities to do so, the government has never disputed that its interpretation would authorize the President to order every federal employee to undergo permanent and irreversible surgeries (*e.g.*, LASIK eye surgery or weight-reduction surgery), ingest experimental or prescription medications (*e.g.*, Adderall, performance enhancing drugs), forgo all drinking, drive only certain types of vehicle to work, assume a vegan or other specific diet, or almost anything else conceivably labeled as "conduct," even though—as the Sixth Circuit held—there is no "logical

stopping point" to this claimed power, which would amount to "a *de facto* police power [of] the President." *Kentucky*, 23 F.4th at 608; ROA.1766.

Any interpretation giving the President such power over line-level federal employees would need to be based on clear textual or historical evidence, but the government has neither.

### C. AGENCIES' IMPLEMENTATION OF THE MANDATE VIOLATES THE APA.

The APA provides an alternative basis for denying the government's motion. Agency action implementing an executive order is subject to judicial review under the APA. *See, e.g.*, *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 669 (9th Cir. 2021); *Coliseum Square Ass'n v. Jackson*, 465 F.3d 215, 232 (5th Cir. 2006); *Reich*, 74 F.3d at 1326–28 (holding that mere fact that "regulations are based on the President's Executive Order hardly seems to insulate them from judicial review under the APA, even if the validity of the Order were thereby drawn into question"); *see also Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 908 (5th Cir. 1983) (holding that the APA's broad definition of the term "rule" includes "virtually every statement an agency may make").

Agency implementation of the Mandate qualifies as reviewable agency action. President Biden expressly told agencies to "implement … a program to require COVID-19 vaccinations" for employees, 86 Fed. Reg at 50,990, and almost every one of the government's declarants openly acknowledged that each *agency* is "requiring its civilian employees to be vaccinated against COVID-19" pursuant to EO14043. ROA.1560–94. All agencies have the same requirements in terms of deadlines, the same refusal to make exceptions for telework or previously infected individuals, and the same abject failure to provide reasoned decisionmaking. ROA.823. As agency implementations and expansions of EO14043, with significant real-world legal consequences and obligations, the agencies' actions are subject to APA review. *See Sloan v. HUD*, 231 F.3d 10, 14 (D.C. Cir. 2000); *Batterton v. Marshall*, 648 F.2d 694, 701–02 (D.C. Cir. 1980).[13]

The District Court held that it "need not reach th[e] question" of whether agency implementations of the Mandate are reviewable under

---

[13] The government argued below that there is no final agency action, but that is just a rehash of its flawed CSRA theory, which is likewise premised on the erroneous view that Plaintiffs are challenging individual employment actions. Each agency has unquestionably adopted and implemented vaccine requirement programs.

the APA, although it seemed to believe that agencies have no "discretion[]" whether to impose the baseline requirement to be vaccinated. ROA.1767. But, with respect, this overlooked the government's own concessions: the government has stated repeatedly that agencies have discretion to retain unvaccinated employees *even* when they do not qualify for a religious or medical exemption. Gov.Br.39 (arguing it "is not a foregone conclusion" that any "plaintiffs are ultimately disciplined for refusing vaccination"); ROA.1795 ("[R]emoval is not a foregone conclusion in any given case").

If that is true, then agencies' "implementation of the federal-worker mandate" is indeed reviewable under the APA, including aspects like whether to preclude discipline for unvaccinated teleworkers or those with natural immunity. ROA.1767. Agencies cannot invoke discretion in one breath and then disclaim it in the next.

In any event, EO14043 merely told agencies to "implement" their own "program[s]," 86 Fed. Reg. at 50,990, and Defendant agencies have *chosen* to follow Task Force requirements setting deadlines and disciplinary procedures, which certainly are discretionary implementations. ROA.1660.

These independent actions render Defendant Agencies' implementations of the Mandate subject to APA review. *See Texas v. Becerra*, No. 2:21-CV-229, ___ F. Supp. 3d ___, 2021 WL 5964687, at *13 (N.D. Tex. Dec. 16, 2021) (invalidating similar mandate on APA grounds).

For the reasons below, the agencies' implementations of the Mandate violate the APA.

### 1. Lack of Reasoned Decisionmaking.

Federal administrative agencies must engage in "reasoned decisionmaking." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) (quotation marks omitted). The "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). This Court's subsequent "review is not toothless. … [I]t has serious bite." *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1136 (5th Cir. 2021).

The individual agency vaccine mandates abjectly fail this reasoned decisionmaking requirement. The mandates provide almost no reasoning, only diktats. ROA.823–1111. Even if the Task Force guidance

is deemed incorporated into agency mandates, it provides no help because it contains only one sentence (really, half a sentence) of rationale: "To ensure the safety of the Federal workforce, Federal employees must be fully vaccinated, except in limited circumstances where an employee is legally entitled to a reasonable accommodation." ROA.789.

Such conclusory justifications are *per se* arbitrary and capricious. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016) ("[C]onclusory statements do not suffice to explain [an agency's] decision.").

And there are plenty of important aspects of the challenged actions that are never justified or even mentioned. For example: Why are vaccines mandated for federal employees when OSHA—as part of the same vaccine mandate roll-out—said that private employers can use testing and masking instead, which would provide "roughly equivalent protection" as a vaccine mandate? *COVID-19 Vaccination and Testing; Emergency Temporary Standard*, 86 Fed. Reg. 61,402, 61,515 (Nov. 5, 2021). "Treating similar situations differently without adequate explanation is the very embodiment of arbitrary conduct." *Rupcich v. United Food & Com. Workers Int'l Union*, 833 F.3d 847, 856 (7th Cir.

2016); *see Missouri v. Biden*, No. 4:21-cv-01329-MTS, 2021 WL 5564501, at *8 (E.D. Mo. Nov. 29, 2021) (invalidating similar mandate where agency "failed to consider or rejected obvious alternatives to a vaccine mandate without evidence").

Also: Why are teleworkers covered? Why is every agency and employee treated the same regardless of location and workplace? Why was the November 22, 2021, deadline chosen? Why is natural immunity insufficient?[14] How was the stepped-disciplinary process chosen? How will agencies decide whom to suspend or terminate? What effects will this have on health and economics?

There may be reasonable answers to these questions, but Defendants simply ignored them. *See Becerra*, 2021 WL 5964687, at *13 (invalidating similar federal vaccine mandate because, *inter alia*, "Defendants allowed regular testing as an alternative to vaccination in the OSHA mandate but provide no explanation why that exception cannot apply here," and the mandate made an unjustifiable "sweeping

_____

[14] Especially given the CDC's report that natural immunity is far superior to vaccine-induced immunity. *See COVID-19 Cases and Hospitalizations by COVID-19 Vaccination Status and Previous COVID-19 Diagnosis — California and New York, May–November 2021*, https://tinyurl.com/2p8t6j99.

application … sans exceptions"); *Missouri*, 2021 WL 5564501, at *7–*11 (invalidating similar federal vaccine mandate for agency's utter failure to address significant questions like those above). *Cf.* 86 Fed. Reg. at 61,436 (OSHA refusing to mandate vaccines because there has not been "a full opportunity to study the potential spectrum of impacts on employers and employees, including the economic and health impacts").

Moreover, the failure to take "any consideration whatsoever' of a [more limited] policy" is itself arbitrary and capricious. *DHS v. Regents of Univ. of Calif.*, 140 S. Ct. 1891, 1912 (2020).

### 2. Agencies' Implementations Are Inconsistent, Illogical, and Contrived.

The agency-level implementations of the Mandate are arbitrary and capricious for another reason: they are illogical, inconsistent, and contrived.

***Inconsistent with OSHA Mandate.*** The agencies do not provide any alternative to vaccination. This conflicts with the OSHA private-employee mandate, which allowed masking and weekly testing as an alternative to mandated vaccinations because "they are similar but slightly different schemes that provide roughly equivalent protection." 86 Fed. Reg. at 61,515. It is inconsistent to give private employees the option

to do regular testing and masking while mandating vaccination for federal employees—especially when these schemes were promulgated contemporaneously.

***Zero Consideration of Employee Characteristics.*** Agency implementations of the Mandate do not distinguish between employees. This Court held that the OSHA private-employee mandate was a "one-size-fits-all sledgehammer that makes hardly any attempt to account for differences in workplaces (and workers)," yet it looks like a "delicately handled scalpel" when compared to the Mandate, which makes *no* attempt at those considerations. *BST*, 17 F.4th at 612. By contrast, in upholding the Centers for Medicare & Medicaid Services ("CMS") vaccine mandate, the Supreme Court focused on its narrow scope, which targeted just one type of facility with the highest COVID risk and even exempted teleworkers. *Biden v. Missouri*, 142 S. Ct. 647, 651 (2022).

***Stated Rationale is Contrived and Inconsistent.*** The Mandate is part of a contrived "work-around" for lack of authority for a nationwide vaccine mandate. Even if an employee vaccine mandate were otherwise legal, giving a false explanation is necessarily arbitrary and capricious. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573–76 (2019).

The Court should therefore affirm on the additional basis that the agencies' implementation of the Mandate is arbitrary and capricious.

## II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING THAT PLAINTIFFS FACE IMMINENT, IRREPARABLE HARM.

"To show irreparable injury if threatened action is not enjoined, it is not necessary to demonstrate that harm is inevitable and irreparable." *Humana, Inc. v. Avram A. Jacobson, M.D.*, 804 F.2d 1390, 1394 (5th Cir. 1986). "The plaintiff need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not *fully* repair the harm." *Id.* (emphasis added). That is, even if money could partially repair the harm, it can still qualify for a preliminary injunction. A district court's finding here is reviewed only for an abuse of discretion. *Texas v. Biden*, 20 F.4th 928, 1001 (5th Cir. 2021).

This Court has held that the unusual nature of putting employees to the choice of "their job(s) and their jab(s)" is irreparable—infringing on what this Court has called "the liberty interests of reluctant individual recipients"—and that resolves the matter here. ROA.1760; *BST*, 17 F.4th at 618; *see* ROA.776. This case is even easier because, unlike the private employees in *BST*, federal employees have no option to be tested in lieu

of vaccination. Every unvaccinated member of F4MF is facing this "Hobson's choice," which provides all the irreparable harm needed.

Moreover, the District Court followed this Court's decision in *Burgess v. FDIC*, 871 F.3d 297 (5th Cir. 2017), which found that government action "injur[ing]" an employee's "ability to procure comparable employment was sufficient to satisfy irreparable injury," *id.* at 304; ROA.1760. That defeats the government's claim that *Burgess* applies only where an employee would face "complete exclusion" from all jobs. Gov.Br.41. The government implies *Burgess* does not apply here because of the CSRA, but (again) Plaintiffs are not bringing individualized employment claims, and Plaintiffs will have no recourse if they succumb to the government's pressure campaign. In any event, *Burgess* itself dealt with a reticulated federal discipline and review system (with the FDIC), but this Court still agreed there was irreparable harm.[15]

There are also reputational harms that independently justify a finding of irreparable harm. Plaintiffs introduced below an affidavit from

---

[15] The government oddly claims the "district court identified no plaintiff who is at imminent risk of injury." Gov.Br.3. The district court pointed to numerous affidavits demonstrating imminent injuries. ROA.1757–58.

an employment expert—to which the government offered no rebuttal affidavit and has forfeited any objection—stating that federal employees who resist the Mandates and suffer discipline will incur unique reputational harm that would never apply to mine-run federal employment actions. ROA.1182. The President labels these employees lawbreakers ("violat[ors] of a lawful order") and "kill[ers]." ROA.1184. He accused them of "overcrowd[ing] our hospitals, … overrunning the emergency rooms and intensive care units, leaving no room for someone with a heart attack, or pancreitis [*sic*], or cancer." ROA.1185. He said those not vaccinated "ha[ve] cost all of us," they "stand in the way of protecting the large majority of Americans who have done their part and want to get back to life as normal," and are "undermining you and … lifesaving actions"—and he would invoke his tremendous "power as President to get them out of the way." ROA.1185.

Being targeted with such rhetoric by the President himself is precisely the kind of reputational damage that cannot be undone with money. ROA.1185. Tellingly, the government refused to defend the President's statements and did not dispute that reputational harm would be irreparable. Indeed, this Court has long recognized irreparable harm

from such reputational injuries, even in the employment context. *See Burgess*, 871 F.3d at 304 (finding irreparable harm where the government's employment actions caused "reputational harm"); *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1056 (5th Cir. 1997) (same, for teacher who supplied expert affidavit in support).

The government also ignores irreparable harms to Plaintiffs like Joshua Roberts, who—if he loses his DHS job—would likely be barred from adopting the two infants he and his wife have fostered since the babies were only a few weeks old. ROA.1227. Plaintiff Thomas David Green is a DHS employee who served in the Marine Corps and Army during Operation Iraqi Freedom III, and he is a single father whose job provides the sole financial support for four minor children. ROA.1219. If these harms are not irreparable, nothing is.

More, employees with religious objections face a "crisis of conscience" that is irreparable. *See Sambrano v. United Airlines, Inc.*, 19 F.4th 839, 841 (5th Cir. 2021) (Ho, J., dissenting); ROA.76; ROA.77. The government claims those with pending religious exemptions do not face any harm, but that is wrong, as shown by employees coerced into

accepting demotions labeled as "religious accommodations," for which they have no recourse. ROA.1817.

Nor can the government demonstrate that the harms described above are not imminent. The government itself touted that it was planning to begin severe discipline imminently in January, meaning employees would soon face the Hobson's choice of their jobs or their jabs. Alex Gangitano & Morgan Chalfant, *Federal Agencies Prepare to Act Against Unvaccinated Employees*, The Hill (Jan. 9, 2022), https://thehill.com/homenews/administration/588836-federal-agencies-prepare-to-act-against-unvaccinated-employees. And many members of F4MF submitted affidavits demonstrating this. *See, e.g.*, ROA.1195; ROA.1204; ROA.1206; ROA.1212; ROA.1216; ROA.1229; ROA.1232; ROA.1242; ROA.1244; ROA.1486; ROA.1493; ROA.1745.

Indeed, putting employees to this imminent Hobson's choice is the entire point of the Mandate: "[T]he value of a sword of Damocles is that it hangs—not that it drops. For every employee who risks his job by testing the limits of the [government's action], many more will choose the cautious path." *Arnett v. Kennedy*, 416 U.S. 134, 231 (1974) (Marshall, J., dissenting).

**III.** **THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING THAT THE PUBLIC INTEREST AND BALANCE OF HARMS FAVOR PLAINTIFFS.**

To be sure, "the public has a strong interest in combating the spread of [COVID-19]. But our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n*, 141 S. Ct. at 2490; *BST*, 17 F.4th at 618 ("Any interest [the government] may claim in enforcing an unlawful" regulation "is illegitimate."). That resolves the matter: the Mandate and its implementation by agencies are illegal, and the government can claim no equity in enforcing an illegal requirement.

As this Court has recognized, the public interest is "served by maintaining our constitutional structure and maintaining the liberty of individuals to make intensely personal decisions according to their own convictions." *BST*, 17 F.4th at 618. The District Court also correctly held—again, reviewable only for an abuse of discretion—that the public will not be served "by terminating unvaccinated workers who provide vital services to the nation." ROA.1768.

In terms of balance of harms, Plaintiffs submitted over a dozen affidavits demonstrating several forms of irreparable harm, as demonstrated above. By contrast, the government's opposition to

Plaintiffs' motion for a preliminary injunction failed to include *any* affidavit on the harms the government would allegedly suffer from an injunction. As a result, the Court should deem the government's subsequent claims of harm unsupported and forfeited.

Even if the Court considered them, the government's claims of harm are unpersuasive. *First*, the District Court found—reviewed only for clear error—that the "government has not shown that an injunction in this case will have any serious detrimental effect on its fight to stop COVID-19." ROA.1768. This was based on statistics from the government itself, showing that "an overwhelming majority of the federal workforce is already vaccinated," *id.*, a fact the White House itself has publicized, citing 98% compliance, *see Press Briefing,* WHITE HOUSE (Jan. 21, 2022), https://www.whitehouse.gov/briefing-room/press-briefings/2022/01/21/ press-briefing-by-press-secretary-jen-psaki-january-21-2022/; Eric Katz, *Some Agencies Report 100% Vaccine Mandate Compliance As Others Begin Suspensions*, GOV. EXEC. (Jan. 11, 2022), https://www.govexec.com/workforce/2022/01/some-agencies-report-100-vaccine-mandate-compliance-others-begin-suspensions/360630/.

The government has touted that it could fire or suspend non-compliant employees without suffering operational concerns, undercutting its litigation claim that COVID-19 absenteeism from those employees would cause irreparable harm. Gangitano & Chalfant, *Federal Agencies Prepare to Act, supra.*

And the government's argument is especially weak given the District Court's finding that unvaccinated employees can still use "masking, social distancing, or part- or full-time remote work." ROA.1769. The government never explains how it will suffer irreparable harm despite those available options, which the government has elsewhere endorsed.

*Second*, the government's claimed harm is especially unconvincing given the lengthy delay in enforcing the Mandate after the President announced it on September 9, 2021. This delay included the winter holidays, despite the government simultaneously warning of a "surge upon a surge" of cases. Noah Higgins-Dunn, *Dr. Fauci Warns the U.S. Will See a 'Surge Upon a Surge' of Covid Cases Following the Holidays*, CNBC (Dec. 1, 2020), https://www.cnbc.com/2020/12/01/dr-fauci-warns-the-us-will-see-a-surge-upon-a-surge-of-covid-cases-following-the-

holidays.html. This suggests the government's sense of urgency depends largely on public optics, not actual harm.

The government's leisurely approach to this case confirms the government's lack of harm. The government delayed more than a week before seeking a stay from the District Court and then waited another week to seek relief in this Court. By comparison, when a district court enjoined the CMS mandate, the government sought stays from both the district court and this Court within *two days*, *see Louisiana v. Becerra*, No. 3:21-cv-03970 (W.D. La.), *appealed*, No. 21-30734 (5th Cir.), and did so within *three days* when the contractor mandate was enjoined nationwide, *see Georgia v. Biden*, No. 1:21-cv-00163 (S.D. Ga.), *appealed*, No. 21-14269 (11th Cir.).

*Third*, the government argues that "allowing the continued service" of employees who refused to comply with the illegal Mandate "will damage good order and discipline." Gov.Addend.27. That is a Catch-22: either comply with an illegal requirement, or the government will claim your lack of compliance hurts morale and thereby justifies keeping the illegal requirement in place. But the government can claim no vested interest in an illegal policy. *Ala. Ass'n*, 141 S. Ct. at 2490. The

government also complains about being unable to process exemption requests, Gov.Br.45–46, but there is no irreparable harm from the inability to exempt people from illegal requirements that are not even in effect. To the contrary, the government has used the exemption process to coerce employees into accepting demotions. ROA.1817.

Finally, the government laments that the District Court "usurp[ed]" the President's power. Gov.Mot.2. But there is "a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). The Mandate is no exception.

* * *

Jurisdictions around the country are rapidly dropping their vaccine mandates and other COVID-19 restrictions, confirming the District Court did not abuse its discretion by finding that "[s]topping the spread of COVID-19 will not be achieved by overbroad policies like the federal-worker mandate." ROA.1769. And even with the injunction in place, federal employees remain free to get vaccinated voluntarily.

## IV. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING THAT BROAD RELIEF IS APPROPRIATE.

The government cannot show the District Court abused its discretion by granting nationwide relief. *Texas*, 809 F.3d at 187. The District Court noted that it "always will be terribly reluctant to go nationwide on injunctive relief," ROA.1858; but it was ultimately persuaded by the "unique facts" of this case, ROA.1770.

*First*, the President's own Task Force has announced that "consistency across government in enforcement of this government-wide policy is desired." ROA.810. There is no abuse of discretion in holding the government to its own desired standard.

*Second*, lead Plaintiff F4MF has over 6,000 registered members "spread across every state and in nearly every federal agency." ROA.1770. Intake survey data demonstrate that over 90% of F4MF members are federal employees. The government now questions whether these public servants are truly "members" of F4MF, Gov.Br.48, but this claim is unpersuasive given that F4MF has already demonstrated that it has standard indicia of membership like leaders who are also members, and nearly 1,000 members who made significant financial contributions to fund *this litigation*. Pls.Addend.1.

Given the vast size of the membership body and its constantly changing characteristics—with employees joining every day, moving between states or agencies, or having exemption requests denied or facing the "Hobson's choice" on a rolling basis—there was no narrower scope of relief that could be determined *ex ante* that would also guarantee "complete relief" to *all* members. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

By finding that tailored relief is not "practical in this case," ROA.1770, the District Court indicated there are so many affected individuals that, without a nationwide injunction, Defendants would undoubtedly impose harm on many people nonetheless entitled to relief. *See League of Women Voters of United States v. Newby*, 838 F.3d 1, 8–9 (D.C. Cir. 2016) ("As a preliminary injunction requires only a likelihood of irreparable injury, Damocles's sword does not have to actually fall on all appellants before the court will issue an injunction.").

The government insists it could "easily" track members of F4MF, Gov.Br.49, but the government has a poor record. During the pendency of this litigation, the government *repeatedly* targeted members of F4MF despite their pending exemption requests, contrary to the government's

own guidance. *See* ROA.1454; ROA.1464; ROA.1600. A different Plaintiff was issued a notice of termination, which his agency then withdrew because it was non-compliant with the agency's disciplinary timeline—but his agency later insisted the withdrawal itself was invalid and the employee would be imminently fired, only to change its mind *again* when undersigned counsel intervened. ROA.1625; ROA.1645.

Similar concerns about ensuring full relief motivated the Southern District of Georgia to issue a nationwide injunction against the contractor mandate, which the Eleventh Circuit refused to narrow on appeal. *Georgia v. Biden*, No. 1:21-CV-163, ___ F. Supp. 3d ___, 2021 WL 5779939, at *12 (S.D. Ga. Dec. 7, 2021), *motion to stay denied*, Order, *Georgia*, No. 21-14269 (11th Cir. Dec. 17, 2021).

*Third*, broad relief complies with *Louisiana v. Becerra*, 20 F.4th 260 (5th Cir. 2021). Judge Brown is also presiding over the other case challenging the Mandate that is most likely to reach a full analysis of the merits (*Rodden*), meaning there is little concern that different courts will "inconsistently rul[e]" when addressing the same claims. 20 F.4th at 263. And *Becerra* endorsed broad injunctions where the "circumstances" of the case call for it, such as when there is "a concern that 'a geographically-

limited injunction would be ineffective.'" *Id.* That concern is present here and is magnified by the many agencies and members involved.

*Fourth*, the government's request to resume "process[ing]" exemption requests is especially insidious. Gov.Br.45. The government has claimed that employees subject to that process "would not be injured." Gov.Mot.21. But consider CIA employee George O'Sullivan, a Purple Heart recipient and 100% service-disabled veteran, who was pressured into accepting the religious "accommodation" of a demotion with a $60,000 pay cut or else face imminent discipline. ROA.1817. Yet the Chair of the CIA's accommodation committee submitted an affidavit stating that "the CIA maintains a diverse, inclusive, equitable, and accessible workplace where differences are valued, and conflicts are managed constructively." ROA.1592. "Inclusive" and "constructive," indeed.[16]

---

[16] The government also says that one Plaintiff—out of 6,000 members—is named in another case challenging EO14043, Gov.Br.51, but that argument is forfeited because it was not raised below in the government's opposition to the preliminary injunction. Anyway, there is no preclusion because no judgment has issued in the other case. *See FDIC v. Nelson*, 19 F.3d 15 (5th Cir. 1994) (memorandum).

## CONCLUSION

The Court should affirm the preliminary injunction.

February 16, 2022                    Respectfully submitted,

/s/ R. Trent McCotter

C. Boyden Gray
R. Trent McCotter
  *Counsel of Record*
Jonathan Berry
Michael Buschbacher
Jared M. Kelson
BOYDEN GRAY & ASSOCIATES
801 17th Street NW, Suite 350
Washington, DC 20006
202-706-5488
mccotter@boydengrayassociates.com

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Fifth Circuit Rule 32 and Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,952 words, excluding the portions exempted by Rule 32(f). This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure Rule 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook and 14-point font

February 16, 2022          /s/ R. Trent McCotter
                           BOYDEN GRAY & ASSOCIATES PLLC
                           801 17th Street NW, Suite 350
                           Washington, DC 20006

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who have consented to electronic service are being served today with a copy of this document via the Court's CM/ECF. All parties in this case are represented by counsel consenting to electronic service.

February 16, 2022

/s/ R. Trent McCotter
BOYDEN GRAY & ASSOCIATES PLLC
801 17th Street NW, Suite 350
Washington, DC 20006