No. 22-40043

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

FEDS FOR MEDICAL FREEDOM; LOCAL 918, AMERICAN
FEDERATION OF GOVERNMENT EMPLOYEES; HIGHLAND
ENGINEERING, INCORPORATED; RAYMOND A. BEEBE, JR.;
JOHN ARMBRUST; et al.,

Plaintiffs-Appellees,

v.

JOSEPH R. BIDEN, JR., in his official capacity as President of the
United States; THE UNITED STATES OF AMERICA; PETE
BUTTIGIEG, in his official capacity as Secretary of Transportation;
DEPARTMENT OF TRANSPORTATION; JANET YELLEN, in her
official capacity as Secretary of Treasury; et al.,

Defendants-Appellants.

On Appeal from the U.S. District Court
for the Southern District of Texas

EN BANC BRIEF FOR APPELLEES

C. Boyden Gray
R. Trent McCotter
  *Counsel of Record*
Jonathan Berry
Michael Buschbacher
Jared M. Kelson
BOYDEN GRAY & ASSOCIATES
801 17th Street NW., Suite 350
Washington, DC 20006
202-706-5488
mccotter@boydengrayassociates.com
*Counsel for Plaintiffs-Appellees*

# CERTIFICATE OF INTERESTED PERSONS

### *Feds for Medical Freedom v. Biden*

No. 22-40043

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.      Highland Engineering, Inc., is a Plaintiff-Appellee. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

2.      Local 918, American Federation of Government Employees, is a Plaintiff-Appellee. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

3.      Feds for Medical Freedom, a/k/a Feds 4 Med Freedom, is a Plaintiff-Appellee. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

4.      Members of Feds for Medical Freedom are interested parties. Feds for Medical Freedom has over 6,000 members. *See* L.R. 28.2.1 ("If a

large group of persons or firms can be specified by a generic description, individual listing is not necessary.").

The following are individual named Plaintiffs-Appellees:

5.    John Armbrust

6.    N. Anne Atkinson

7.    Julia Badger

8.    Michael Ball

9.    Raymond A. Beebe, Jr.

10.   Craigan Biggs

11.   Laura Brunstetter

12.   Mark Canales

13.   Michele Caramenico

14.   Andrew Chamberland

15.   David Clark

16.   Diane Countryman

17.   Kevin Dantuma

18.   Jose Delgado

19.   Jordan DeManss

20.   George Demetriou

21.  Keri Divilbiss

22.  Mercer Dunn IV

23.  William Filkins

24.  Jonathan Gragg

25.  Bryon Green

26.  Thomas David Green

27.  Erika Hebert

28.  Peter Hennemann

29.  Neil Horn

30.  Carey Hunter-Andrews

31.  Tana Johnston

32.  Tyler Klosterman

33.  Deborah Lawson

34.  Dan Lewis

35.  Melissa Magill

36.  Kendra Ann Marceau

37.  Dalia Matos

38.  Stephen May

39.  Steven McComis

40.  Christopher Miller

41.  Joshua Moore

42.  Brent Moores

43.  Jesse Neugebauer

44.  Joshua Nicely

45.  Leslie Carl Petersen

46.  Patti Rivera

47.  Joshua Roberts

48.  Ashley Rodman

49.  M. LeeAnne Rucker-Reed

50.  Trevor Rutledge

51.  Nevada Ryan

52.  James Charles Sams III

53.  Michael Schaecher

54.  Christina Schaff

55.  Kurtis Simpson

56.  Barrett Smith

57.  Jaci ReNee Smith

58.  Jarod Smith

59. Jana Spruce

60. John Tordai

61. Sandor Vigh

62. Christine Vrtaric

63. Pamela Weichel

64. David Wentz

65. Jason Wilkerson

66. Patrick Wright

67. Patrick Mendoza York

The following are individual named Defendants-Appellants:

68. Kiran Ahuja, in her official capacities as Director of the Office of Personnel Management and Co-Chair of Safer Federal Workforce Task Force

69. Lloyd J. Austin III, in his official capacity as Secretary of Defense

70. Joseph R. Biden, Jr., in his official capacity as President of the United States

71. Antony Blinken, in his official capacity as Secretary of State

72. Matthew C. Blum, in his official capacity as Federal Acquisition Regulatory Council member

73.  William J. Burns, in his official capacity as Director of the Central Intelligence Agency

74.  Pete Buttigieg, in his official capacity as Secretary of Transportation

75.  Robin Carnahan, in her official capacities as Administrator of the General Services Administration and Co-Chair of Safer Federal Workforce Task Force

76.  Leslie A. Field, in her official capacity as Federal Acquisition Regulatory Council member

77.  Marcia Fudge, in her official capacity as Secretary of Housing and Urban Development

78.  Merrick B. Garland, in his official capacity as Attorney General

79.  Jennifer M. Granholm, in her official capacity as Secretary of Energy

80.  Deb Haaland, in her official capacity as Secretary of Interior

81.  Avril Haines, in her official capacity as Director of National Intelligence

82.  Daniel Hokanson, in his official capacity as Chief of the National Guard Bureau

83. Karla S. Jackson, in her official capacity as Federal Acquisition Regulatory Council member

84. Kilolo Kijakazi, in her official capacity as Acting Commissioner of Social Security

85. Jeffrey A. Koses, in his official capacity as Federal Acquisition Regulatory Council member

86. Alejandro Mayorkas, in his official capacity as Secretary of Homeland Security

87. Denis McDonough, in his official capacity as Secretary of Veterans Affairs

88. Bill Nelson, in his official capacity as Administrator of the National Aeronautics and Space Administration

89. Samantha Power, in her official capacity as Administrator of the United States Agency for International Development

90. Gina M. Raimondo, in her official capacity as Secretary of Commerce

91. John M. Tenaglia, in his official capacity as Federal Acquisition Regulatory Council member

92. Tom Vilsack, in his official capacity as Secretary of Agriculture

93. Marty Walsh, in his official capacity as Secretary of Labor

94. Janet Yellen, in her official capacity as Secretary of Treasury

95. Shalanda D. Young, in her official capacity as Director of the Office of Management and Budget

96. Jeffrey Zients, in his official capacity as co-chair of the Safer Federal Workforce Task Force

The following government entities are Defendant-Appellants:

97. Central Intelligence Agency

98. Department of Agriculture

99. Department of Commerce

100. Department of Defense

101. Department of Energy

102. Department of Homeland Security

103. Department of Housing and Urban Development

104. Department of Interior

105. Department of Justice

106. Department of Labor

107. Department of State

108. Department of Transportation

109. Department of Treasury

110. Department of Veterans Affairs

111. Federal Acquisition Regulatory Council

112. General Services Administration

113. National Aeronautics and Space Administration

114. National Guard Bureau

115. Office of Management and Budget

116. Office of Personnel Management

117. Office of the Director of National Intelligence

118. Safer Federal Workforce Task Force

119. Social Security Administration

120. The United States of America

121. United States Agency for International Development

The following are counsel in the case:

122. Boyden Gray & Associates PLLC: C. Boyden Gray, R. Trent McCotter, Jonathan Berry, Michael Buschbacher, and Jared M. Kelson are counsel for Plaintiffs-Appellees.

123. U.S. Department of Justice: Brian M. Boynton, Sarah Wendy Carroll, Marleigh D. Dover, Brit Featherston, James Gillingham,

Sarah E. Harrington, Casen Ross, Charles W. Scarborough, Lowell V. Sturgill Jr., and Daniel Winik are counsel for Defendants-Appellants.

Dated: August 26, 2022

/s/ R. Trent McCotter
R. Trent McCotter
*Counsel of Record for Plaintiffs-Appellees*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ...........................................i

TABLE OF CONTENTS ............................................................... xi

TABLE OF AUTHORITIES ........................................................ xiii

INTRODUCTION ......................................................................... 1

STATEMENT OF JURISDICTION .............................................. 9

STATEMENT OF THE ISSUES .................................................. 9

STATEMENT OF THE CASE ................................................... 10

    I.    Factual Background. ............................................... 10

    II.   District Court Proceedings. .................................... 11

    III.  Fifth Circuit Panel Proceedings. ........................... 12

SUMMARY OF THE ARGUMENT ........................................... 13

STANDARD OF REVIEW.......................................................... 14

ARGUMENT ............................................................................... 15

    I.    The CSRA Does Not Preclude Plaintiffs' Claims................. 16

          A.   Ongoing Unconstitutional Coercion: *Thunder Basin* and *BST Holdings*........................................... 16

          B.   *Elgin* Did Not Silently Overrule Decades of Precedent Authorizing Pre-Enforcement Challenges to Government-Wide Executive Policies. ..................... 22

          C.   Text, Structure, and History Confirm Plaintiffs' Claims Are Not Precluded. ........................................... 29

D.  The *Thunder Basin* Factors Confirm Plaintiffs'
    Claims Are Not Precluded. ............................................ 38

II.  The District Court Correctly Held that the Vaccine
     Mandate Is Ultra Vires. ............................................ 44

     A.  The President Lacked Statutory Power. ...................... 44

     B.  Several Clear-Statement Doctrines Confirm the
         Lack of Statutory Authority. ............................... 53

     C.  The President Lacked Inherent Article II Power to
         Issue the Vaccine Mandate. ................................. 57

III.  Agencies' Implementation of the Mandate Violates the
      APA. .............................................................. 59

IV.  The District Court Did Not Abuse Its Discretion in
     Finding that Plaintiffs Face Imminent, Irreparable Harm. 60

V.  The District Court Did Not Abuse Its Discretion in
    Finding that the Public Interest and Balance of Harms
    Favor Plaintiffs. ................................................... 64

VI.  The District Court Did Not Abuse Its Discretion in
     Finding that Broad Relief Is Appropriate. ..................... 67

CONCLUSION ................................................................ 70

CERTIFICATE OF COMPLIANCE ................................................ 72

CERTIFICATE OF SERVICE ................................................... 73

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abdelfattah v. DHS,* 787 F.3d 524 (D.C. Cir. 2015) ................................ 17

*Adams v. Woods*, 6 U.S. (2 Cranch) 336 (1805) ....................................... 47

*Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485 (2021) ............... 54, 56, 64

*A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495
 (1935) ........................................................................................................ 56

*Altschuld v. Raimondo*, No. 1:21-cv-2779, 2021 WL 6113563
 (D.D.C. Nov. 8, 2021) ........................................................................... 15

*AFGE v. Biden*, 576 F. Supp. 3d 1155 (S.D. Fla. 2021) ........................... 15

*AFGE v. FLRA*, 794 F.2d 1013 (5th Cir. 1986) .................................. 7, 22

*AFGE v. Sec'y of the Air Force*, 716 F.3d 633 (D.C. Cir. 2013) .............. 25

*AFGE v. Trump*, 929 F.3d 748 (D.C. Cir. 2019) ....................................... 25

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015) ............. 17

*Arnett v. Kennedy*, 416 U.S. 134 (1974) .................................................... 19

*BST Holdings, LLC v. OSHA*, 17 F.4th 604
 (5th Cir. 2021) .................................... 4, 6, 15, 18, 54, 55, 57, 61, 64, 65

*Burgess v. FDIC*, 871 F.3d 297 (5th Cir. 2017) ....................................... 62

*Califano v. Yamasaki*, 442 U.S. 682 (1979) .............................................. 69

*Carr v. Saul*, 141 S. Ct. 1352 (2021) ........................................................ 44

*Church v. Biden*, 573 F. Supp. 3d 118 (D.D.C. 2021) .............................. 15

*Cochran v. SEC*, 20 F.4th 194
(5th Cir. 2021) ...................................... 7, 17, 26, 28, 30, 36, 39–41, 43

*Elgin v. Dep't of Treasury*, 567 U.S. 1
(2012) .................................................. 7, 20, 26, 27, 30, 35, 38, 41, 42

*FLEOA v. Cabaniss*, No. 1:19-cv-735, 2019 WL 5697168
(D.D.C. Nov. 4, 2019) .................................................. 25, 38

*FLEOA v. Rigas*, No. 1:19-cv-735, 2020 WL 4903843
(D.D.C. Aug. 20, 2020) .......................................................... 38

*Foley v. Biden*, No. 4:-21-cv-1098, 2021 WL 7708477 (N.D. Tex.
Oct. 6, 2021) ........................................................................... 15

*Fornaro v. James*, 416 F.3d 63 (D.C. Cir. 2005)...................................... 25

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477
(2010) .................................................................. 9, 31, 35, 39, 40, 43

*FTC v. Bunte Brothers, Inc.*, 312 U. S. 349 (1941) .................................. 58

*Greiner v. United States*, 900 F.3d 700 (5th Cir. 2018) .......................... 23

*Gremillion v. Chivatero*, 749 F.2d 276 (5th Cir. 1985) .......................... 23

*Grisham v. United States*, 103 F.3d 24 (5th Cir. 1997) .......................... 23

*Gundy v. United States*, 139 S. Ct. 2116 (2019) ................................. 56, 57

*Humana, Inc. v. Avram A. Jacobson, M.D.*, 804 F.2d 1390
(5th Cir. 1986) ........................................................................ 60

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607
(1980) ................................................................................... 57

*Kentucky v. Biden*, 23 F.4th 585 (6th Cir. 2022) ..................... 3, 52, 53, 55

*Knight v. Kirby Offshore Marine Pac., L.L.C.*, 983 F.3d 172 (5th
Cir. 2020) ............................................................................ 23

*Kreschollek v. S. Stevedoring Co.*, 78 F.3d 868 (3d Cir. 1996) ............... 40

*League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) .................................................................... 69

*Louisiana v. Becerra*, 20 F.4th 260 (5th Cir. 2021) ............................. 67

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ............................................ 43

*McCray v. Biden*, 574 F. Supp. 3d 1 (D.D.C. 2021) ................................ 15

*McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1981) ............... 43

*MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118 (2007) ................... 17

*Mississippi v. Johnson*, 71 U.S. 475 (1866) ........................................... 17

*Morales v. Dep't of Army*, 947 F.2d 766 (5th Cir. 1991) ........................ 23

*Myers v. United States*, 272 U.S. 52 (1926) ........................................... 59

*Mylan Lab'ys Ltd. v. Janssen Pharmaceutica, N.V.*, 989 F.3d 1375 (Fed. Cir. 2021) .......................................................................... 21

*NFFE v. Weinberger*, 818 F.2d 935 (D.C. Cir. 1987) ........................... 7, 25

*NFIB v. Dep't of Labor*, 142 S. Ct. 661 (2022) ... 2, 4, 33, 49, 51, 52, 54, 56

*NTEU v. Bush*, 891 F.2d 99 (5th Cir. 1989) ........................................... 23

*NTEU v. Devine*, 733 F.2d 114 (D.C. Cir. 1984) .................................. 7, 24

*NTEU v. Horner*, 854 F.2d 490 (D.C. Cir. 1988) ..................................... 25

*NTEU v. Whipple*, 636 F. Supp. 2d 63 (D.D.C. 2009) ...................... 35, 43

*OCONUS DOD Emp. Rotation Action Grp. v. Cohen*, 144 F. Supp. 2d 1 (D.D.C. 2000) .................................................................... 38

*Oklahoma v. Biden*, No. 21-cv-1136, 2021 WL 6126230 (W.D. Okla. Dec. 28, 2021) ...................................................... 15

*Palermo v. Rorex*, 806 F.2d 1266 (5th Cir. 1987) .................................... 23

*Panama Ref. Co. v. Ryan*, 293 U.S. 388 (1935) ....................................... 56

*Robinson v. California*, 370 U.S. 660 (1962) ......................................... 48

*Rodden v. Fauci*, 571 F. Supp. 3d 686 (S.D. Tex. 2021)......................... 15

*Rollins v. Marsh*, 937 F.2d 134 (5th Cir. 1991)..................................... 23

*Salinas v. U.S. R.R. Ret. Bd.*, 141 S. Ct. 691 (2021) ............................. 30

*Sambrano v. United Airlines, Inc.*, 19 F.4th 839 (5th Cir. 2021) ........... 62

*Sambrano v. United Airlines, Inc.*, No. 21-11159, 2022 WL 486610
    (5th Cir. Feb. 17, 2022) ................................................................. 61, 62

*Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020).................................... 58

*Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159
    (2001) ............................................................................................. 55

*Texas v. Biden*, 20 F.4th 928 (5th Cir. 2021).................................... 60, 67

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994) ......... 6, 18, 38, 43

*Topletz v. Skinner*, 7 F.4th 284 (5th Cir. 2021)..................................... 14

*Tubesing v. United States*, 810 F.3d 330 (5th Cir. 2016) ...................... 23

*Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333
    (D.D.C. 2020) ................................................................................. 33

*United States v. Fausto*, 484 U.S. 439 (1988)....................................... 23

*West Virginia v. EPA*, 142 S. Ct. 2587 (2022) .................................. 53, 59

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) ......................... 30

*Whole Woman's Health v. Jackson*, 142 S. Ct. 522 (2021) .................... 17

*Yates v. United States*, 574 U.S. 528 (2015) ............................................. 45

*Zummer v. Sallet*, 37 F.4th 996 (5th Cir. 2022) ...................................... 23

PUBLIC LAWS AND U.S. CODE

5 U.S.C. § 553 ................................................................. 37

5 U.S.C. § 701 ................................................................. 9

5 U.S.C. § 2302 ............................................................ 32–34

5 U.S.C. § 3301 ............................................................ 44–46

5 U.S.C. § 3302 ............................................................ 44–46

5 U.S.C. § 7301 .................................................. 44, 47–49, 52, 53

5 U.S.C. § 7513 ............................................................... 50

8 U.S.C. § 1182 .............................................................. 55

28 U.S.C. § 1292 ............................................................. 9

28 U.S.C. § 1331 ........................................................... 9, 30

28 U.S.C. §1346 .............................................................. 9

28 U.S.C. § 1361 ............................................................. 9

28 U.S.C. § 1651 ............................................................ 20

28 U.S.C. § 2201 ............................................................. 9

29 U.S.C. § 651 ............................................................. 49

40 U.S.C. § 101 ............................................................ 45

Hatch Act, Pub. L. No. 76-252, 53 Stat. 1147 (1939) ............................... 51

REGULATORY MATERIALS AND EXECUTIVE ORDERS

Executive Order 10096 ................................................................. 50

Executive Order 11491 ................................................................. 50

Executive Order 12674 ................................................................. 51

Executive Order 14043 ...................................................... 1, 10, 44

15 Fed. Reg. 389 (Jan. 25, 1950) ................................................ 50

34 Fed. Reg. 17,605 (Oct. 31, 1969) ......................................... 51

54 Fed. Reg. 15,159 (Apr. 14, 1989) ........................................ 51

62 Fed. Reg. 43,451 (Aug. 9, 1997) .......................................... 49

77 Fed. Reg. 24,339 (Apr. 18, 2012) ........................................ 49

86 Fed. Reg. 50,989 (Sept. 9, 2021) ......................................... 10

MISCELLANEOUS

Alex Gangitano & Morgan Chalfant, *Federal Agencies Prepare to Act Against Unvaccinated Employees*, THE HILL, https://thehill.com/homenews/administration/588836-federal-agencies-prepare-to-act-against-unvaccinated-employees (Jan. 9, 2022) ...................................................................... 64, 67

Anna Giaritelli, *Thousands of Unvaccinated Border Patrol Agents Fear for Their Future*, WASH. EXAMINER (June 7, 2022), https://www.washingtonexaminer.com/news/thousands-of-unvaccinated-border-patrol-agents-fear-for-their-future ................... 64

Department of State circular of March 20, 1841, *reprinted in* U.S. Civil Serv. Comm'n, *History of the Federal Civil Service: 1789 to the Present* (1941) ............................................................... 51

Noah Higgins-Dunn, *Dr. Fauci Warns the U.S. Will See a 'Surge Upon a Surge' of Covid Cases Following the Holidays*, CNBC (Dec. 1, 2020), https://www.cnbc.com/2020/12/01/dr-fauci-warns-the-us-will-see-a-surge-upon-a-surge-of-covid-cases-following-the-holidays.html. .................................................................. 66

Task Force, *COVID-19 Workplace Safety: Agency Model Safety Principles* (Sept. 13, 2021) ................................................. 10

Task Force, *Initial Implementation Guidance for Federal Agencies* (Aug. 17, 2022), https://www.saferfederalworkforce.gov/downloads/Initial Implementation Guidance_CDC Streamline_20220817.pdf.............. 66

THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (1969) ................................................................................. 47

WEBSTER'S AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1838) ................................................................................. 47

## INTRODUCTION

The District Court did not abuse its discretion by enjoining enforcement of the President's unilateral and unprecedented executive order requiring millions of federal civilian employees to undergo a permanent and irreversible medical procedure ("the vaccine mandate" or "EO14043"). Plaintiffs challenge the imposition of the vaccine mandate and the ongoing coercion to be vaccinated against their will. And if they give in, as many will be compelled to do, the government will have infringed their liberty interests, but they will not have suffered a statutorily recognized "adverse employment action" and thus will be unable to subsequently challenge the vaccine mandate or receive any remedy. They must challenge the mandate now.

As the District Court held, "this case is not about whether folks should get vaccinated against COVID-19," nor is it about "the federal government's power, exercised properly, to mandate vaccination of its employees." ROA.1751–52. And employees remain free to get vaccinated voluntarily. This case is instead about "whether the President can, with the stroke of a pen and without the input of Congress, require millions of

federal employees to undergo a medical procedure as a condition of their employment." ROA.1752.

Thus, the "question before us is not how to respond to the pandemic, but who holds the power to do so." *NFIB v. Dep't of Labor*, 142 S. Ct. 661, 670 (2022) (Gorsuch, J., concurring). This Court must determine "who decides" whether to impose a vaccine mandate as a term of employment on the entire federal civilian workforce: is it Congress acting through bicameralism and presentment, or is it the President acting unilaterally?

The President is not the CEO of a private company. His powers are limited and enumerated. Under current law as construed by the Supreme Court, Congress—not the President with "a stroke of a pen"—is empowered to make such a momentous decision. But Congress did not authorize the vaccine mandate. It is therefore ultra vires.

The government relies on vague statutory language about employee "conduct"—which the government concedes is "narrow in scope," Gov.Reply.Br.19—as alleged support for the President's decision to require vaccination as a term of employment. But the vaccine mandate is not a regulation of federal employees *qua* employees. Rather, it is a general health and safety measure, issued without authority from

Congress. And even if there were some ambiguity in the relevant statutes, several clear-statement canons—including the major-questions doctrine and the federalism canon—confirm that the President lacks such power.

To support its view, the government makes the outlandish claim that the President has statutory authority to order or prohibit *any* "conduct" for millions of federal civilian employees, even "off-duty conduct" and even when it targets an employee's immutable "status"— unless Congress has expressly "*prohibited* the President" from doing so. Gov.EB.Br.33–35. This statutory interpretation would render superfluous entire provisions of the Civil Service Reform Act ("CSRA"). There is also no "logical stopping point" to the government's theory, which would amount to "a *de facto* police power [of] the President." *Kentucky v. Biden*, 23 F.4th 585, 608 (6th Cir. 2022). The government claims to have found the largest of elephants in what it concedes is a "narrow" statutory mousehole. Gov.Reply.Br.19.

The government's back-up argument is that the President has inherent Article II power to mandate permanent and irreversible medical procedures for all federal employees. That theory would again render

nearly the entire CSRA superfluous or conflict with its terms. But the government never argues that any part of the CSRA is unconstitutional, meaning the government cannot invoke inherent Article II power over line-level federal civilian employees to circumvent that statute. Moreover, the government has been unable to cite any prior example in the Nation's nearly 250-year history where a President ordered civilian employees to undergo a medical procedure of any kind, let alone a permanent and irreversible one. "This lack of historical precedent, coupled with the breadth of authority that the [President] now claims, is a telling indication that the mandate extends beyond the [executive branch's] legitimate reach." *NFIB*, 142 S. Ct. at 666 (cleaned up).

The District Court was also well within its discretion in finding that Plaintiffs had demonstrated several types of irreparable harm, most notably in the form of ongoing governmental coercion to be vaccinated against their wishes, which this Court has already identified as a "threat[] to substantially burden the liberty interests of reluctant individual recipients put to a choice between their job(s) and their jab(s)." *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021). The government has forfeited almost all claims of its own irreparable harm,

which are unpersuasive anyway because the government has recently stated that unvaccinated employees should be treated the same as vaccinated employees, and the government has also expressly *disclaimed* any reliance on the risk of workplace spread of COVID-19. Gov't.Reply.Br.15.

Nor did the District Court abuse its discretion by granting clear and broad injunctive relief. The court simply gave the government what its own COVID-19 Safer Federal Workforce Task Force ("Task Force") requested: "consistency across government in enforcement of this government-wide policy is desired." ROA.810. And Plaintiffs' members are so numerous (over 6,000) and spread over so many geographic locations and agencies that a clear and broad injunction was the only way to ensure *ex ante* that they all receive protection.

It is thus unsurprising that the government seeks to avoid this Court's consideration of the merits altogether by claiming that review is precluded by the CSRA, which funnels individualized challenges to past employment actions through an administrative scheme. The government claims the CSRA applies to Plaintiffs' pre-enforcement challenge to a government-wide executive order imposing ongoing unconstitutional

coercion, even though Plaintiffs expressly disclaim any individual CSRA employment claims and do not seek any employment relief like backpay or reinstatement.

The government is wrong because Plaintiffs' claims are not "of the type Congress intended to be reviewed within th[e] statutory structure" of the CSRA. *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212 (1994). *First*, the Supreme Court held in *Thunder Basin* that there would be no implied preclusion in "a situation in which compliance is sufficiently onerous and coercive penalties [are] sufficiently potent that a constitutionally intolerable choice" is presented. *Id.* at 218. This Court has *already* held that a governmental vaccine mandate amounts to just such an intolerable choice because it "threatens to substantially burden the liberty interests of reluctant individual recipients put to a choice between their job(s) and their jab(s)," amounting to "the loss of constitutional freedoms." *BST Holdings*, 17 F.4th at 618. The combination of those two holdings resolves the preclusion issue here.

*Second*, longstanding precedent authorizes pre-enforcement challenges to new government-wide executive policies, which are as far as imaginable from the routine, individual challenges to past adverse

employment actions covered by the CSRA's scheme. It's no wonder that the government's position on this issue has been labeled "discredited," "meritless," and "completely baseless" by such distinguish jurists as Ruth Bader Ginsburg, Antonin Scalia, Harry Edwards, and Robert Bork. *NFFE v. Weinberger*, 818 F.2d 935, 940 (D.C. Cir. 1987); *NTEU v. Devine*, 733 F.2d 114, 117 n.8 (D.C. Cir. 1984). And this Court has long agreed with those jurists. *See, e.g., AFGE v. FLRA*, 794 F.2d 1013, 1015–16 (5th Cir. 1986); *see also* Slip.Op.18 (Barksdale, J., dissenting).

The government theorizes that those decades of circuit precedent were silently overruled by *Elgin v. Department of Treasury*, 567 U.S. 1 (2012). This Court's en banc decision in *Cochran v. SEC*, 20 F.4th 194, 206 (5th Cir. 2021), *cert. granted*, 142 S. Ct 2707 (2022), rejected the argument that *Elgin* effected a sea change in preclusion. *Elgin* involved CSRA preclusion of individual, past terminations and said nothing about the broadside pre-enforcement challenges that had been allowed for decades. Indeed, the government's own merits brief in *Elgin* acknowledged there could be "an employment-related action that would not be judicially reviewable under the CSRA and yet would rise to the level of constitutional significance" warranting immediate judicial

review. Resp.Br.17–18, *Elgin*, 567 U.S. 1. Plaintiffs thus ask this Court to adopt the view previously espoused by the Department of Justice itself.

*Third*, the text, structure, and purpose of the CSRA all confirm that Plaintiffs' claims are not precluded. The text of the CSRA says nothing about pre-enforcement challenges to new employment policies imposing ongoing unconstitutional coercion, and Plaintiffs do not challenge individualized, prior adverse employment actions. It also makes little sense that Congress would have intended every employee to incur discipline and then bring separate CSRA challenges to the legality of a new government-wide policy affecting over 2 million employees, as demonstrated by decades of precedent allowing pre-enforcement challenges in such circumstances.

*Fourth*, the government also fails the Supreme Court's so-called *Thunder Basin* factors for determining when claims are impliedly precluded. Absent immediate judicial review, most employees will be left without meaningful relief at all. If they unwillingly submit to vaccination (as most employees will be coerced to do), they will never experience an adverse action covered by the CSRA and thus cannot bring an

administrative claim. And even if they could, the Merit Systems Protection Board cannot undo a permanent and irreversible vaccination.

In short, the vaccine mandate imposes ongoing unconstitutional coercion causing a "here-and-now injury" requiring "here-and-now" relief from a district court. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 513 (2010). The District Court properly enjoined the vaccine mandate. This Court should affirm.

## STATEMENT OF JURISDICTION

The District Court had jurisdiction under 5 U.S.C. §§ 701–706, 28 U.S.C. §§ 1331, 1346, 1361, 2201, under the United States Constitution, and pursuant to the Court's equitable powers. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

(1)    Whether the Civil Service Reform Act strips district courts of jurisdiction over pre-enforcement challenges to new government-wide executive policies imposing ongoing unconstitutional coercion.

(2)    Whether the District Court correctly held that the President's unprecedented and unilateral act of mandating that millions of

civilian employees undergo a permanent and irreversible medical procedure to keep their jobs was ultra vires.

(3)     Whether the District Court abused its discretion by finding that Plaintiffs demonstrated irreparable and imminent injury, and that the balance of harms and equities favored Plaintiffs.

(4)     Whether the District Court abused its discretion by finding that the unique facts of this case warrant clear, broad injunctive relief.

## STATEMENT OF THE CASE

### I.     FACTUAL BACKGROUND.

On September 9, 2021, President Biden issued EO14043, which states that "it is necessary to require COVID-19 vaccination for all Federal employees, subject to such exceptions as required by law." 86 Fed. Reg. 50,989 (Sept. 9, 2021). On September 13, 2021, the Task Force issued a guidance document, recommending a deadline of November 22, 2021, for all federal employees to be fully vaccinated. Task Force, *COVID-19 Workplace Safety: Agency Model Safety Principles* 2 (Sept. 13, 2021), ROA.788.

In a subsequent "FAQ," the Task Force stated that "[e]mployees who are on maximum telework or working remotely are not excused from this requirement," nor are employees with natural antibodies. ROA.799. Employees who failed to comply by November 22, 2021, "are in violation of a lawful order" and subject to discipline, "up to and including termination or removal." ROA.810.

## II.   DISTRICT COURT PROCEEDINGS.

Lead Plaintiff Feds for Medical Freedom ("F4MF") has over 6,000 registered members, who respectively work in every State and for almost every federal agency. ROA.1193. Many are federal employees with no pending vaccine mandate exemption requests, and some were threatened with imminent discipline unless they submit to vaccination against their will. Over 1,500 F4MF members have contributed financially to the organization, including approximately 1,000 members who contributed financially to this litigation (averaging over $300 per person). Pls.Addend.1 (filed Feb. 9, 2022). Plaintiff Local 918 is also a membership group representing certain DHS employees. ROA.74.

Plaintiffs filed suit on December 21, 2021, and moved for a preliminary injunction the next day, arguing the vaccine mandate is

ultra vires and that Defendants' implementation of it is arbitrary and capricious under the Administrative Procedure Act. Plaintiffs repeatedly stated that they "do not challenge any individual employment decision in this suit" and do not seek employment relief. ROA.75; ROA.76; ROA.118; ROA.138.

On January 21, 2021, the District Court enjoined enforcement and implementation of EO14043 because it is ultra vires. ROA.1751.

### III. FIFTH CIRCUIT PANEL PROCEEDINGS.

The government appealed and sought emergency relief, but on February 9, 2022, a divided motions panel of this Court ordered the government's stay motion to be carried with the case. *See* Slip.Op.4. The Court ordered expedited merits briefing and oral argument, which occurred on March 8, 2022. The merits panel issued its decision on April 7, 2022.

The majority concluded that the CSRA precludes review of Plaintiffs' challenges. Slip.Op.14. Judge Barksdale dissented, arguing that a "pre-enforcement challenge to a government-wide policy" is not precluded by the CSRA. Slip.Op.17. The panel unanimously denied the

government's stay motion as moot. Plaintiffs sought rehearing en banc, which the Court granted.

## SUMMARY OF THE ARGUMENT

The Court should affirm the District Court's well-reasoned order issuing a preliminary injunction against the unprecedented vaccine mandate. Jurisdiction over this case is appropriate for multiple reasons, including decades of precedent allowing pre-enforcement challenges to new government-wide regulations, especially when they impose ongoing constitutional harm.

On the merits, the government forfeited most of its arguments by not raising them in opposition to the motion for a preliminary injunction. In any event, the government's arguments are all unpersuasive. Its case largely depends on the theory that the President's power to regulate executive employees' "conduct," buried in the middle of a statute about mundane employment matters, gave him the power to control every aspect of those employees' lives. But Supreme Court precedent and numerous canons of construction foreclose that view. And the government's theory that the President can exercise inherent Article II power to mandate such medical procedures for all federal civilian

employees is completely unsupported by history and inconsistent with the very existence of the CSRA. The government does not challenge the constitutionality of that statute, which governs the President's power over federal civilian employees.

Finally, the District Court did not abuse its discretion in finding that Plaintiffs would suffer imminent and irreparable harm absent relief, in line with this Court's precedent on federally-imposed vaccine mandates, or by awarding clear and broad relief. Plaintiff F4MF alone has over 6,000 members, spread across every State and nearly every federal agency. When coupled with the government's repeated inability to track employees during this litigation, the District Court correctly concluded that only a clear injunction would ensure relief to F4MF's members.

## STANDARD OF REVIEW

"This court reviews the grant or denial of a preliminary injunction for abuse of discretion, with any underlying legal determinations reviewed de novo and factual findings for clear error." *Topletz v. Skinner*, 7 F.4th 284, 293 (5th Cir. 2021).

## ARGUMENT

At the outset, Plaintiffs address the government's repeated reliance on the bare fact that other district courts denied preliminary relief against the vaccine mandate. Gov.EB.Br.1; Gov.Br.1, 15, 18, 51.[1]

The government's attempt to paint the District Court as overly eager to grant relief is unsupported and misleading given that the same District Judge had previously *denied* a motion for a preliminary injunction against the same vaccine mandate in a different case. ROA.1754. As the District Court explained in its Order, the government's reliance on prior decisions denying relief is unpersuasive because those cases suffered from obvious flaws not present here, such as suing the wrong defendants,[2] suing over the wrong policies,[3] or filing prematurely and thus providing no evidence of coercion.[4] ROA.1754. Those defective

---

[1] "Gov.EB.Br." refers to the government's en banc brief filed July 27, 2022. "Gov.Br." refers to the government's original opening merits brief filed February 15, 2022. "Gov.Reply.Br." refers to the government's merits reply brief filed February 18, 2022.

[2] *See, e.g.*, *Foley v. Biden*, No. 4:-21-cv-1098, 2021 WL 7708477 (N.D. Tex. Oct. 6, 2021); *McCray v. Biden*, 574 F. Supp. 3d 1 (D.D.C. 2021); *Rodden v. Fauci*, 571 F. Supp. 3d 686 (S.D. Tex. 2021).

[3] *See, e.g.*, *Oklahoma v. Biden*, 577 F. Supp. 3d 1245 (W.D. Okla. 2021).

[4] *See, e.g.*, *AFGE v. Biden*, 576 F. Supp. 3d 1155 (S.D. Fla. 2021); *Altschuld v. Raimondo*, No. 1:21-cv-2779, 2021 WL 6113563 (D.D.C. Nov. 8, 2021); *Church v. Biden*, 573 F. Supp. 3d 118 (D.D.C. 2021).

cases are hardly persuasive compared to the District Court's in-depth consideration here. The District Court's analysis also has the distinct advantage of being correct and should be affirmed.

## I. THE CSRA DOES NOT PRECLUDE PLAINTIFFS' CLAIMS.

The Complaint in this case states repeatedly that "Plaintiffs do *not* challenge any individual employment decisions," nor do Plaintiffs seek typical employment-related relief like reinstatement or backpay. ROA.75; ROA.76; ROA.118; ROA.138. Rather, Plaintiffs bring a pre-enforcement challenge to a new government-wide executive order that puts millions of federal civilian employees to the "Hobson's choice" between "their job(s) and their jab(s)." *BST Holdings*, 17 F.4th at 618.

The District Court correctly concluded that Plaintiffs' claims are not impliedly precluded by the CSRA. Numerous bases support that holding.

### A. ONGOING UNCONSTITUTIONAL COERCION: *THUNDER BASIN* AND *BST HOLDINGS*.

Jurisdiction is appropriate here under a straightforward combination of the Supreme Court's decision in *Thunder Basin* and this Court's decision in *BST Holdings*.

There is a longstanding historical tradition of courts issuing injunctive relief against *ongoing* constitutional violations and "violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). This "negative injunction remedy" is a "'standard tool of equity' … that federal courts have authority to entertain under their traditional equitable jurisdiction" dating back to the Judiciary Act of 1789, § 11, 1 Stat. 78, and even earlier to English tradition, *see Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 540 (2021) (Thomas, J., concurring in part).

Thus, "where threatened action by government is concerned," courts "do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007); *Cochran*, 20 F.4th at 210 ("[T]he threat of irreparable harm may justify pre-enforcement judicial review under principles of equity."); *Abdelfattah v. DHS*, 787 F.3d 524, 534 (D.C. Cir. 2015) ("[T]he CRSA d[oes] not preclude judicial review of such constitutional claims altogether. Civil servants and job applicants

could still 'seek equitable relief against their supervisors, and the agency itself, in vindication of their constitutional rights.'").

In accordance with this presumption of review for ongoing constitutional violations, the Supreme Court noted in *Thunder Basin* the strong presumption against implied preclusion in a "situation in which compliance is sufficiently onerous and coercive penalties [are] sufficiently potent that a constitutionally intolerable choice" is presented. 510 U.S. at 218.

This Court has *already* held that government-imposed vaccine mandates impose just such a constitutionally intolerable choice on employees by "threaten[ing] to substantially burden the liberty interests of reluctant individual recipients put to a choice between their job(s) and their jab(s)," amounting to "the loss of constitutional freedoms." *BST Holdings*, 17 F.4th at 618.

Combining *Thunder Basin* and *BST Holdings* confirms that a challenge to ongoing constitutional coercion is not precluded, absent clear statutory text to the contrary, which the government never claims exists

here.[5] And the District Court correctly held that Plaintiffs had alleged and proven such ongoing unconstitutional coercion here. *See* ROA.1757; ROA.1760. In fact, the vaccine mandate here is even more draconian than the one in *BST Holdings*, as there is no alternative for testing in lieu of vaccination.[6]

Indeed, putting employees to this choice is the entire point. As Justice Thurgood Marshall once stated, "[T]he value of a sword of Damocles is that it hangs—not that it drops. For every employee who risks his job by testing the limits of the [government's action], many more will choose the cautious path." *Arnett v. Kennedy*, 416 U.S. 134, 231 (1974) (Marshall, J., dissenting). The government is relying on that

---

[5] Congress knows how to preclude courts from redressing certain ongoing injuries. *See, e.g.*, 12 U.S.C. § 1818(i)(1) (FDIC proceedings).

[6] The government says Plaintiffs have not raised a claim that the mandate "violate[s] their constitutional rights." Gov.EB.Br.25, 44. The District Court correctly held that Plaintiffs raised and proved constitutional harms from ongoing coercion. *See* ROA.1757; ROA.1760; ROA.115; ROA.116; ROA.117; ROA.776. The government apparently refers only to the fact that Plaintiffs did not bring a standalone *cause of action* asserting individual constitutional violations, but that is because this is an ultra vires challenge that does not raise individual adverse employment actions.

calculus, under which it can keep coercing employees to get vaccinated but still avoid meaningful judicial review.

Moreover, the government's own Supreme Court merits brief in *Elgin* (the opinion in that case is discussed further in Part I.B, *infra*), which involved CSRA preclusion for individualized past terminations, acknowledged there could be "an employment-related action that would not be judicially reviewable under the CSRA and yet would rise to the level of constitutional significance" such that a court could immediately entertain a challenge. Resp.Br.17–18, *Elgin*, 567 U.S. 1. Plaintiffs' claim of unconstitutional coercion is precisely such an action.

The government now tries to abandon its view in *Elgin*. Raising a position it never advanced in the District Court or before the panel, the government claims that the only way for immediate judicial review of employment policies imposing ongoing unconstitutional harm is via the All Writs Act, 28 U.S.C. § 1651, by seeking a writ of mandamus from the Federal Circuit in the case of "obviously unlawful directives." Gov.EB.Br.26. This not only directly contradicts the government's steadfast insistence on complete CSRA exclusivity and repeated claims that administrative exhaustion is always required, but also elides that

the All Writs Act "does not expand a court's jurisdiction" or apply until "a party has at least taken the first preliminary step that might lead to appellate jurisdiction in this court in the future." *Mylan Lab'ys Ltd. v. Janssen Pharmaceutica, N.V.*, 989 F.3d 1375, 1380 (Fed. Cir. 2021) (cleaned up). In other words, the CSRA does not apply or bestow jurisdiction (be it via mandamus or otherwise) until the government has taken a defined adverse employment action, which is missing here. *See* Slip.Op.9 (acknowledging that "the current [P]laintiffs" have *not* "already suffered an adverse employment action").[7]

The government's *Elgin* brief was correct that some employment-related actions are simply *outside* the CSRA. The ongoing coercion caused by the vaccine mandate is sufficient to confer jurisdiction on this Court.

---

[7] Because there is no adverse employment action, the government's theory means mandamus would have to be issued directly against the President, given that he issued the vaccine mandate—but that contradicts longstanding Supreme Court precedent. *See Mississippi v. Johnson*, 71 U.S. 475, 499 (1866) (labeling the notion of enjoining the President "'an absurd and excessive extravagance'").

## B. *ELGIN* DID NOT SILENTLY OVERRULE DECADES OF PRECEDENT AUTHORIZING PRE-ENFORCEMENT CHALLENGES TO GOVERNMENT-WIDE EXECUTIVE POLICIES.

If there were any doubt, Plaintiffs' ability to bring a pre-enforcement ultra vires challenge to a new government-wide executive policy is supported by precedent, which *Elgin* left undisturbed.

### 1. Decades of Precedent Support Plaintiffs.

Judge Barksdale's panel dissent persuasively explains that the CSRA simply does not preclude pre-enforcement challenges to government-wide employment regulations, which are as far as imaginable from the types of routine, individualized challenges to prior employment actions covered by the CSRA. Slip.Op.17–18 (Barksdale, J., dissenting).

This Court has long agreed with Judge Barksdale's dissent. In 1986, this Court addressed a challenge to a "government-wide regulation promulgated by the Office of Personnel Management," and held that if a plaintiff "wishes to challenge the validity of this … regulation, there are other means available," such as "challenging [the] regulations in district court." *AFGE*, 794 F.2d at 1015–16.

Three years later, when a union of federal employees challenged President Reagan's executive order requiring drug testing of certain

22

federal employees, first in district court and then on appeal, this Court not only decided the challenge to the executive order on the merits, but expressly authorized additional suits "against the individual agency plans implementing the [executive o]rder" as well. *NTEU v. Bush*, 891 F.2d 99, 102 (5th Cir. 1989).

Between them, *AFGE* and *NTEU* cite the CSRA *over fifteen times*. The opinions provided "explication[s] of the governing rules of law" for bringing such challenges, and thus their statements are binding holdings. *Knight v. Kirby Offshore Marine Pac., L.L.C.*, 983 F.3d 172, 177 (5th Cir. 2020). Plaintiffs relied on *AFGE* and *NTEU* when bringing this lawsuit.

The panel decision in this case, however, never cited these cases. Instead, it—just like the government, *see* Gov.EB.Br.19—relied exclusively on decisions involving the easily distinguishable scenario where employees challenged their *individualized* prior discipline and sought *standard employment relief* like reinstatement or damages—core CSRA claims seeking core CSRA remedies.[8] Those are nothing like the

---

[8] *See United States v. Fausto*, 484 U.S. 439, 441 (1988) (seeking "backpay" for suspension); *Zummer v. Sallet*, 37 F.4th 996, 1005, 1007–08 (5th Cir.

*(footnote continued on next page)*

pre-enforcement ultra vires challenge to a government-wide policy here, where Plaintiffs expressly *disclaim* any challenge to individual employment actions or entitlement to relief like reinstatement or backpay—and thus there is no statutorily-recognized adverse action that they seek to "reverse." Slip.Op.5–6, 8 n.3.

Distinguished jurists have long agreed with Judge Barksdale and this Court's precedent. For example, Judge Harry Edwards, joined by then-Judges Robert Bork and Antonin Scalia, labeled as "meritless" the idea that the CSRA "impliedly precludes preenforcement judicial review of rules" imposing "dramatic changes in federal personnel practices relating to reduction in force procedures, performance management systems, and pay administration." *Devine*, 733 F.2d at 114, 117 n.8.

---

2022) (seeking "to reverse the adverse employment decisions" of "suspension and termination"); *Griener v. United States*, 900 F.3d 700, 702 (5th Cir. 2018) (seeking "damage[s]" for termination); *Tubesing v. United States*, 810 F.3d 330, 332 (5th Cir. 2016) (same); *Grisham v. United States*, 103 F.3d 24, 25 (5th Cir. 1997) (same); *Morales v. Dep't of Army*, 947 F.2d 766, 768–79 (5th Cir. 1991) (same); *Rollins v. Marsh*, 937 F.2d 134, 136 (5th Cir. 1991) (seeking "damages" after being disciplined); *Palermo v. Rorex*, 806 F.2d 1266, 1268 (5th Cir. 1987) (seeking "monetary damages" for "wrongfully commenc[ing] disciplinary proceedings"); *Gremillion v. Chivatero*, 749 F.2d 276, 277–78 (5th Cir. 1985) (seeking "damages" for "wrongful discharge").

In another case, Judge Edwards and then-Judge Ruth Bader Ginsburg not only rejected the notion of pre-enforcement CSRA preclusion, but expressly "discourage[d] any future litigant who might have the effrontery to engage the District Court with this discredited theory of subject matter jurisdiction." *Weinberger*, 818 F.2d at 940, 941 n.11 (authorizing constitutional and APA challenges to a government-wide employment regulation).

And in a third case, the D.C. Circuit held that judicial review of "minor personnel actions" is barred by CSRA, but a challenge to "a major policy decision" is not within the CSRA. *NTEU v. Horner*, 854 F.2d 490, 497 (D.C. Cir. 1988).

The D.C. Circuit has not overruled these opinions, nor has there been any flood of employment actions as a result of them. *But see* Gov.EB.Br.22 (claiming, without evidence, that allowing such claims would "gut the CSRA scheme").[9]

---

[9] The government touts language from *Fornaro v. James*, 416 F.3d 63 (D.C. Cir. 2005), that "what you get under the CSRA is what you get," *id.* at 68, but the government conveniently omits the preceding clause that says, "[S]o far as review of *determinations under the CSRA* is concerned," *id.* (emphasis added). Plaintiffs do not seek review of such

(*footnote continued on next page*)

## 2. *Elgin* Did Not Overrule Decades of Precedent.

The government suggests the Supreme Court's decision in *Elgin* silently overruled the decades of uniform caselaw from this Court and the D.C. Circuit. Gov.EB.Br.14–22. Even setting aside the strong presumption against implied overruling, the argument that *Elgin* effected a sea change is already foreclosed by this Court's *en banc* decision holding that *Elgin* "did not break new ground" in the area of preclusion. *Cochran*, 20 F.4th at 206. Indeed, *Elgin*—just like the government's other cases—involved individualized "challenges [to] an adverse employment action," which the employees sought "to reverse" and "to receive the compensation they would have earned." 567 U.S. at 5, 22. The plaintiffs had alleged that it was unconstitutional to terminate them for failing to comply with a longstanding statute requiring registration with the selective service. *Id.* at 6–7.

determinations. *Fornaro* also involved a *different* "CSRA," the Civil Service *Retirement* Act. *Id.* at 64.

The government next cites *AFGE v. Trump*, 929 F.3d 748 (D.C. Cir. 2019), and *AFGE v. Secretary of the Air Force*, 716 F.3d 633 (D.C. Cir. 2013); Gov.EB.Br.21, but neither case involved the CSRA provisions at issue here. And, as the U.S. District Court for the District of Columbia has already explained, those decisions should not be read to negate the well-established precedent allowing pre-enforcement claims. *FLEOA v. Cabaniss*, No. 1:19-cv-735, 2019 WL 5697168, at \*6 (D.D.C. Nov. 4, 2019).

The plaintiffs in *Elgin* thus had a prototypical adverse action (termination) that they wanted to "reverse," and they sought prototypical "relief that the CSRA routinely affords" (backpay and reinstatement). *Id.* at 22. The Court held that the CSRA applies to such employees' claims, regardless of whether they were premised on constitutional challenges to statutes. *Id.* at 15. In short, when a plaintiff has suffered a statutorily-covered adverse action, the CSRA provides the sole scheme.

But *Elgin* said nothing about pre-enforcement challenges of the type that had been allowed for decades, especially where—as here—the plaintiffs expressly forgo any challenge to CSRA-defined adverse actions and disclaim any entitlement to "relief that the CSRA routinely affords." *Id.* at 22. Such pre-enforcement challenges, which do not involve prior adverse actions and instead seek to invalidate a government-wide policy, are simply not within the CSRA. This explains why Justice Scalia found no inconsistency in joining the majorities in both *Elgin* and *Devine*, where he had labeled as "meritless" the very same preclusion argument the government now peddles to this Court.

The government claims there would be a "gaping loophole" in the CSRA if the plaintiffs in *Elgin* could have avoided preclusion by suing

before their terminations. Gov.EB.Br.22. But as *Cochran* held, the possibility of such suits is minimized by the requirement to demonstrate standing via imminent harm, and any request for preliminary injunctive relief would require a showing of *irreparable* harm to the employee, making it even less likely that such suits could obtain immediate judicial relief. *See Cochran*, 20 F.4th at 210–11.

In any event, the government is simply wrong that allowing immediate judicial review in certain circumstances is illogical. Judge Costa's dissent in *Cochran* explained how the "seemingly anomalous result" that a party can obtain immediate judicial review *before* (but not after) the initiation of adverse agency action is entirely logical where "[t]here is no [statutory] scheme for judicial review of" those pre-enforcement actions. *Cochran*, 20 F.4th at 246 n.15 (Costa, J., dissenting). In such cases, "falling back on general federal question jurisdiction does not undermine any contrary statutory path." *Id.* The CSRA likewise does not reach pre-enforcement claims, even though an actual termination would trigger the CSRA and thereby preclude immediate judicial review under *Elgin*.

More, as Judge Barksdale's dissent suggested, it is especially unlikely that Congress intended to preemptively preclude challenges to every yet-to-be-formulated executive employment policy (as here), even if preclusion might be implied for challenges to *established statutory requirements* (as in *Elgin*). *See* Slip.Op.17–18 (Barksdale, J., dissenting). Indeed, the cases where this Court and the D.C. Circuit allowed pre-enforcement claims all involved challenges to newly issued executive policies, not statutes.

Accordingly, *Elgin* is of no help to the government. Perhaps that is why the government's opposition to Plaintiffs' motion for a preliminary injunction directly cited *Elgin* only once. ROA.1526. In fact, the government's arguments on preclusion have changed dramatically throughout this case. Rather than try to hit a moving target, the Court should re-adopt the longstanding decisions in *AFGE* and *NTEU*, as well as those from the D.C. Circuit, which are persuasive and correct.

### C. TEXT, STRUCTURE, AND HISTORY CONFIRM PLAINTIFFS' CLAIMS ARE NOT PRECLUDED.

Even setting aside the CSRA-specific precedents discussed above, the traditional tools used by the Supreme Court when resolving questions of implied preclusion confirm that Plaintiffs' claims are not precluded.

The Supreme Court has looked to the text, structure, and history of the particular statutory scheme at issue, and also considered the so-called *Thunder Basin* factors. *See Elgin*, 567 U.S. at 10, 15. Applying either framework confirms that Plaintiffs' claims are not precluded. *See also* Part I.D, *infra* (analyzing *Thunder Basin* factors).

The Supreme Court has held that there is a "strong presumption favoring judicial review" of executive action, and the Government may rebut that presumption only by carrying the "'heavy burden' of showing that the statute's 'language or structure' forecloses judicial review." *Salinas v. U.S. R.R. Ret. Bd.*, 141 S. Ct. 691, 698 (2021). This strong presumption derives from 28 U.S.C. § 1331, which provides district courts with jurisdiction over "all" federal-question suits. "Not some or most—but all." *Cochran*, 20 F.4th at 199.

Accordingly, when a district court is confronted with an effort to enjoin unconstitutional government action, the "question" is "not whether" some statute "*confers* jurisdiction," but whether some other statute "*removes* the jurisdiction given to the federal courts" under § 1331. *Whitman v. Dep't of Transp.*, 547 U.S. 512, 514 (2006) (emphases added).

### 1. Statutory Text.

The government has pointed to no part of the CSRA that expressly addresses pre-enforcement challenges like those brought by Plaintiffs. *See Free Enter. Fund*, 561 U.S. at 489 (considering significant that the statutory text "does not expressly limit the jurisdiction that other statutes confer on district courts"). Rather, the CSRA provides a list of defined "adverse actions"—none of which includes a pre-enforcement ultra vires challenge to ongoing coercion from a government-wide regulation—and then the CSRA charts an administrative scheme for pursuing challenges to those defined adverse actions.

The panel decision and the government posit several alleged textual bases to preclude review, but none withstands scrutiny. The panel first suggested that the vaccine mandate is a "proposed" adverse employment action covered by the CSRA. Slip.Op.9–10 (citing 5 U.S.C. § 7513(b)). In the majority's telling, 2.1 million employees were suddenly subjected to a "proposed adverse action" the moment the President issued the vaccine mandate, such that they were immediately entitled to "an opportunity to respond, legal representation, and written reasons supporting the employing agency's decision." *Id.* at 7.

But not even the government has raised that argument—and for good reason. Judge Barksdale's dissent correctly explains that the CSRA's language about "proposed" actions (1) expressly applies only to actions by "an employing agency," not by the President; and (2) refers to "individual employees" receiving formal notice of a *specific* proposed discipline, not a *general threat* by the President to discipline "an entire class of employees." *Id.* at 18 (Barksdale, J., dissenting). This is confirmed by the fact that the CSRA provides an "opportunity to respond, legal representation, and written reasons," none of which make sense for a general threat simultaneously issued to millions of employees. *Id.*

The panel opinion then posited a far-fetched scenario where employees could try to challenge the vaccine mandate by filing petitions with the Office of Special Counsel ("OSC"), which entertains whistle-blower complaints, pursuant to 5 U.S.C. § 2302. Slip.Op.12. The government raises this theory only in the most perfunctory manner, forfeiting the issue. Gov.EB.Br.26. But in any event the panel's reading is erroneous. The vaccine mandate is not a "'significant change in … working conditions'" under § 2302, Slip.Op.12 (quoting 5 U.S.C. § 2302(a)(2)(A)(xii)), most notably because the *government itself* has

disclaimed that the vaccine mandate addresses workplace spread of COVID-19, *see* Gov't.Reply.Br.15.

The government's concession is also consistent with the Supreme Court's holding in the context of the OSHA vaccine mandate that "[a]lthough COVID–19 is a risk that occurs in many workplaces, it is not an occupational hazard in most." *NFIB*, 142 S. Ct. at 665. That is because "COVID–19 can and does spread at home, in schools, during sporting events, and everywhere else that people gather. That kind of universal risk is no different from the day-to-day dangers that all face from crime, air pollution, or any number of communicable diseases." *Id.*

The panel decision relied on an interpretation of working conditions found in a *different* title of the CSRA, Slip.Op.12 & n.4, but as the District Court explained, "working conditions" as used in § 2302(a)(xii) "generally refers to the daily, concrete parameters of a job, for example, hours, discrete assignments, and the provision of necessary equipment and resources," not mandated medical procedures, and certainly not procedures addressing a "universal risk" untethered from the workplace. ROA.1756 (quoting *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 367 (D.D.C. 2020)); *see NFIB*, 142 S. Ct. at 665.

Critically, even if the vaccine mandate were a change in working conditions under § 2302, there is no free-standing right to challenge such a change. The change has to result from one of an enumerated list of actions like discrimination or retaliation—none of which applies here. *See* 5 U.S.C. § 2302(b). The majority suggested that § 2302(b)(12) applies, but that requires a violation of a *separate* "law, rule, or regulation" *implementing* one of the aspirational "principles" from § 2301, so even if a principle from § 2301 were implicated by the vaccine mandate, that is not enough—there must be an express "implement[ation]" of that principle that would apply here, but the majority never identifies any such implementation, *see* Slip.Op.12. In short, the OSC route is entirely unavailing.

The lack of textual support for the government's view confirms that Plaintiffs' claims fall within § 1331's strong presumption of review.[10]

---

[10] The government claims Plaintiffs must be relying on adverse employment actions for standing. Gov.EB.BR.22. That is incorrect. Ongoing coercion provides an injury for standing, as do imminent-but-unrealized employment harms (as was true in the 1980s pre-enforcement cases discussed above).

## 2. Statutory Structure.

The structure of the CSRA also confirms there is no congressional intent to preclude claims like Plaintiffs'. As Judge Barksdale's dissent explained, Plaintiffs launch a "pre-enforcement challenge to a government-wide policy, imposed by the President, that would affect 2.1 million federal civilian workers," and thus the "[r]elief plaintiffs seek does not fall within the purpose of the CSRA." Slip.Op.17 (Barksdale, J., dissenting). In short, Plaintiffs' claims are simply *different in kind* from the standard CSRA claim. Enjoining enforcement of an executive order that puts millions of employees to an illegal and impossible choice is hardly "relief that the CSRA routinely affords," *Elgin*, 567 U.S. at 22; Slip.Op.17–18 (Barksdale, J., dissenting), especially given the admittedly unprecedented nature of the vaccine mandate.

To be sure, Plaintiffs' "requested relief would prohibit further use of the [employment] regulation"—as is always the case for pre-enforcement challenges to a regulation—"but [Plaintiffs] do[] not seek individual relief for specific employee claims. The CSRA does not preclude this type of rulemaking challenge." *NTEU v. Whipple*, 636 F. Supp. 2d 63, 69 (D.D.C. 2009).

The panel decision also asserted that Plaintiffs' claims were not "structural" challenges like those in *Free Enterprise Fund*, 561 U.S. at 490, *see* Slip.Op.11; Gov.EB.Br.24, but if an ultra vires challenge to a government-wide executive policy is not a structural separation-of-powers challenge, it is difficult to imagine what *would* qualify. *See* Part I.D.2, *infra* (explaining why this challenge is collateral to the CSRA).

### 3. History and Purpose.

The CSRA's history and purpose also confirm that Plaintiffs' claims are not precluded. As demonstrated above, there is a long history of this Court and the D.C. Circuit holding that challenges to broad, new regulations involving employment are not precluded by the CSRA. The panel opinion suggested that allowing a pre-enforcement challenge would open the floodgates of litigation, which could yield inconsistent employment decisions. Slip.Op.10. But that is wrong three times over.

*First*, as Judge Barksdale's dissent explained, it is the *government's* position that will actually "result in the very type of lengthy and haphazard results CSRA was enacted to prevent," because Congress would not have wanted employees trying to bring thousands of separate administrative challenges to the *same* underlying government policy

when a single lawsuit in district court could resolve the matter. Slip.Op.17 (Barksdale, J., dissenting).

*Second*, "doctrines, such as standing, ripeness, exhaustion, sovereign immunity, and abstention" would narrow the class of cases subject to district court review, avoiding the possibility of employees bringing lawsuits for every perceived violation. *Cochran*, 20 F.4th at 211. Moreover, only a showing of *irreparable* harm could trigger preliminary injunctive relief.

*Third*, longstanding precedent in this Court and the D.C. Circuit allowing such claims clearly did not open the floodgates of litigation in those courts.

\* \* \*

For these reasons, the text, structure, and purpose of the CSRA all favor Plaintiffs.

### 4. The APA.

The Administrative Procedure Act provides additional statutory evidence that Congress did not intend to preclude review of broadside challenges to regulations that touch on employment. The APA excludes "agency management or personnel" regulations from notice and

comment, 5 U.S.C. § 553(a)(2), but does *not* exclude such regulations from any substantive APA requirements, like acting in accordance with law and avoiding arbitrary and capricious acts, or judicial review. This selective preclusion provides further evidence that Congress did not intend to preclude broadside challenges to the substance of new policies merely because they are personnel-related. Indeed, courts have held that APA claims are especially unlikely to be precluded in this context. *See, e.g.*, *FLEOA v. Rigas*, No. 1:19-cv-735, 2020 WL 4903843, at *3–4 (D.D.C. Aug. 20, 2020); *Cabaniss*, 2019 WL 5697168, at *4–6; *OCONUS DOD Emp. Rotation Action Grp. v. Cohen*, 144 F. Supp. 2d 1, 6–8 (D.D.C. 2000).

### D. THE *THUNDER BASIN* FACTORS CONFIRM PLAINTIFFS' CLAIMS ARE NOT PRECLUDED.

Even when there is evidence that Congress may have intended to preclude review, courts look to the so-called "*Thunder Basin* factors," which apply a "presumption that Congress does not intend to limit district court jurisdiction if 'a finding of preclusion could foreclose all meaningful judicial review'; if the suit is 'wholly collateral to a statute's review provisions'; and if the claims are 'outside the agency's expertise.'" *Elgin*, 567 U.S. at 15 (citing *Thunder Basin*) (cleaned up). Plaintiffs' claims of unconstitutional coercion fit neatly within that framework.

1.  **Preclusion Would Foreclose Meaningful Judicial Review.**

The panel opinion claimed that employees have an opportunity for meaningful judicial review because they can simply get fired and then challenge their terminations through administrative processes and appeal to the Federal Circuit. Slip.Op.11. But that fundamentally misunderstands the District Court's holding. Plaintiffs challenge an *ongoing process* that is causing irreparable constitutional harm. This is a "'here-and-now' injury" that can only be "remedied by a court" *now*. *Free Enter. Fund*, 561 U.S. at 513. The District Court correctly held that employees face the "irreparable injury" of ongoing government coercion to get vaccinated. ROA.1757. And if they give in (as most do to save their livelihoods), they will not be subjected to a CSRA-covered adverse action at all, meaning they "will not be able to obtain judicial review" of their coercion claims "unless the district court hears it now." *Cochran*, 20 F.4th at 203.

The panel opinion and government therefore err by pointing to types of *post hoc* CSRA relief—"reinstatement, backpay, and attorney's fees," Slip.Op.11—as if those somehow provide a remedy for Plaintiffs' claim of *ongoing* coercion, for which there is no *post hoc* remedy in the

CSRA. And even if those coerced employees could bring such a claim through the CSRA, the Merit Systems Protection Board has no power to undo a permanent and irreversible vaccination.

As noted above, the panel also posited a far-fetched scenario where employees could try to challenge the vaccine mandate by filing petitions with OSC. Slip.Op.12. But under the Supreme Court's precedents, "we presume that Congress does not intend to limit jurisdiction if 'a finding of preclusion *could* foreclose all meaningful judicial review.'" *Free Enter. Fund*, 561 U.S. at 489 (emphasis added). The test is therefore not whether meaningful review *must* be foreclosed or even *likely* would be foreclosed—but simply whether it "threatens to deprive [plaintiffs] of the opportunity" to raise challenges. *Cochran*, 20 F.4th at 199.

"To be sure, it is possible that [a Plaintiff] could ultimately wind her way through enforcement proceedings and get some later chance at judicial review—but it is also possible that she could never have that opportunity, *and that is enough to preserve district court jurisdiction*." *Cochran*, 20 F.4th at 210 (emphasis added). And that is also enough to resolve this *Thunder Basin* factor in favor of Plaintiffs.

## 2. Plaintiffs' Claims Are Collateral to the CSRA.

The Supreme Court has indicated that whether a claim is collateral to the CSRA depends on whether the plaintiffs "request[] relief that the CSRA routinely affords." *Elgin*, 567 U.S. at 22.

As Judge Barksdale's dissent explained, declaring void an executive order that puts millions of employees to an illegal and impossible choice is hardly "relief that the CSRA routinely affords." *Elgin*, 567 U.S. at 22; Slip.Op.17–18 (Barksdale, J., dissenting). It is therefore collateral to the CSRA regime.

The panel opinion quoted *Elgin* as alleged support for the view that Plaintiffs' challenge is not collateral to the CSRA because this case presents the "'vehicle by which [Plaintiffs] seek' to avoid imminent 'adverse employment action." Slip.Op.13 (quoting *Elgin*, 567 U.S. at 22). But that is wrong for several reasons. *First*, as discussed above, Plaintiffs challenge the ongoing unconstitutional coercion as a separate injury.

*Second*, the full quote from *Elgin*—which the panel opinion elided— was that the plaintiffs were using their lawsuit as "the vehicle by which they seek to *reverse* the removal decisions," 567 U.S. at 22 (emphasis added), which confirms the CSRA's backward-looking focus. Plaintiffs do

not seek "to reverse" any covered employment actions. *See* Slip.Op.13 (acknowledging that "[P]laintiffs are not attempting to reverse any previous discipline").

*Third*, the government's theory would render nearly every challenge "non-collateral," as there is almost always some related action that the agency would be unable to achieve if the plaintiffs prevailed in court. That cannot be reconciled with Supreme Court precedents, which demonstrate that the mere collateral consequence of stopping underlying substantive executive action does not automatically result in the challenge being deemed non-collateral. In *Free Enterprise Fund*, for example, the Court considered it self-evident that the petitioners' "general challenge" to the PCAOB's very "existence" was "collateral," even though that challenge, if successful, could have precluded PCAOB from undertaking *any actions whatsoever*. 561 U.S. at 490.[11]

---

[11] Other cases have likewise deemed "wholly collateral" certain challenges that would ultimately have negated the executive's power to take certain actions. *See McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479, 492 (1981) (deeming "collateral" a broad challenge to amnesty determination procedures) (recounted in *Thunder Basin*, 510 U.S. at 213); *Mathews v. Eldridge*, 424 U.S. 319, 324–25, 330 (1976) (labeling "entirely collateral" a due process challenge to administrative procedures established for assessing the existence of a continuing disability); *see also Cochran*, 20 F.4th at 207.

To be sure, Plaintiffs' "requested relief would prohibit further use of the [employment] regulation"—as has always been the case for pre-enforcement challenges to regulations—"but [Plaintiffs] do[] not seek individual relief for specific employee claims. The CSRA does not preclude this type of rulemaking challenge." *Whipple*, 636 F. Supp. 2d at 69.

### 3.    Agencies Have No Expertise Here.

The panel opinion suggested that agencies have sufficient expertise in constitutional issues or might dispose of the case on some preliminary question. Slip.Op.13–14. But the Supreme Court has held the opposite: "agency adjudications are generally ill suited to address structural constitutional challenges, which usually fall outside the adjudicators' areas of technical expertise." *Carr v. Saul*, 141 S. Ct. 1352, 1360 (2021).

Further, there is little basis to believe agencies could avoid addressing the core separation-of-powers challenges to EO14043, given that it imposes a *requirement* to be vaccinated. The only way for an employee to avoid that requirement at the administrative level is to argue that EO14043 is itself invalid—precisely the type of claim that agencies have no expertise resolving.

For all these reasons, the District Court correctly concluded that it had jurisdiction.

## II. THE DISTRICT COURT CORRECTLY HELD THAT THE VACCINE MANDATE IS ULTRA VIRES.

### A. THE PRESIDENT LACKED STATUTORY POWER.

The District Court correctly held that none of the three statutory sources invoked by the government—5 U.S.C. §§ 3301, 3302, and 7301—provides the President with the power to issue a vaccine mandate for millions of federal civilian employees. ROA.1761–62. In its briefing on the preliminary injunction below, the government barely even defended this point, spending only a *single page* on the matter, and thus many of its arguments to this Court should be deemed forfeited. ROA.1545. Moreover, the government has candidly acknowledged that "the statutes here are narrow in scope." Gov.Reply.Br.19. Too narrow, it turns out, to support the vaccine mandate.

#### 1. Sections 3301 and 3302.

The District Court correctly held that the first two invoked statutes—sections 3301 and 3302—grant the President only certain limited powers not relevant here. ROA.1762. Those sections appear in a

subchapter of Title 5 entitled "Examination, Certification, and Appointment," and in a chapter entitled "Examination, Selection, and Placement," which confirms these statutes do not extend to whether *existing* employees can keep their jobs. *See Yates v. United States*, 574 U.S. 528, 540 (2015) (headings "supply cues" to interpreting statutes).

The government tries to portray the District Court as befuddled because it cited federal *contractor* mandate decisions when analyzing § 3301. Gov.EB.Br.36. But the language in § 3301 ("promote the efficiency of [the civil] service") parallels the language in 40 U.S.C. § 101 ("an economical and efficient system for" procurement), which the government claims authorizes the contractor mandate. The District Court was not confused; rather, it aptly cited cases rejecting the claim that vaccines can be mandated on this "efficiency" basis, be it in § 3301 or § 101. ROA.1762.

The government has apparently abandoned its prior argument that § 3301's "authority to establish requirements for *new* federal employees logically includes the authority to modify requirements for *existing* employees." Gov.Br.37 (emphases added). Besides being forfeited, that argument is meritless because it ignores that Congress prescribed

45

different authority governing entry into and management of the federal workforce, using different language in entirely separate chapters of Title 5.

The government next argues that § 3302's "identification of specific matters the President *must* address does not impliedly prohibit the President from addressing other matters," Gov.EB.Br.37, but this argument was not raised below and is forfeited. In any event, the President's authority to "prescribe rules" must be interpreted in context of the entire statute, which demonstrates its limited reach to subjects like "exempt[ing] certain employees from civil-service rules and from certain reports and examinations, and … prohibit[ing] marital and disability discrimination." ROA.1763. The District Court thus properly concluded after reviewing the entirety of § 3302 that "not even a generous reading of the text provides authority for a vaccine mandate." ROA.1763; *see Adams v. Woods*, 6 U.S. (2 Cranch) 336, 341 (1805) ("[G]eneral expressions may be restrained by subsequent particular words, which shew that in the intention of the legislature, those general expressions are used in a particular sense[.]"). The government's view would push the word "rules" past its breaking point by allegedly authorizing the

President to impose public health measures and commandeer nearly every aspect of federal employees' lives.

## 2. Section 7301.

The crux of the District Court's decision turned on whether requiring vaccination is "conduct" for purposes of 5 U.S.C. § 7301, which states: "The President may prescribe regulations for the conduct of employees in the executive branch." But being vaccinated is not "conduct" in its commonly understood sense. *See* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (1969) ("[t]he way a person acts; behavior"); WEBSTER'S AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1838) ("personal behavior; course of actions; deportment" or "[m]anagement; mode of carrying on"). A permanent and irreversible measure results in a status, not the regulation of conduct. That alone resolves the matter. *See Robinson v. California*, 370 U.S. 660, 666–67 (1962) (distinguishing status and conduct).

The District Court correctly held that *even assuming* the vaccine mandate regulates conduct, EO14043 is still ultra vires because § 7301 is best read as authorizing regulation of *workplace and employment* conduct, and "[a]ny broader reading would allow the President to

prescribe, or proscribe, certain private behavior by civilian federal workers outside the context of their employment." ROA.1763.

The government claims there is no textual limitation to employment conduct, Gov.EB.Br.34, but the government forfeited that argument by not raising it in its opposition below. Anyway, the government is wrong. Section 7301 expressly references conduct for those "in the executive branch," indicating a clear tie to conduct in their executive branch capacity.

It also beggars belief that the simple word "conduct" authorizes widespread vaccine mandates. *First*, the government has conceded that § 7301 is "narrow in scope." Gov.Reply.Br.19. *Second*, setting aside whether § 3301 would authorize a vaccine mandate for *applicants*, its text—which specifically references "ascertain[ing] … health" for applicants—differs noticeably from § 7301's reference to regulating "conduct" of current employees. Congress knows how to authorize executive branch inquiries into individual health matters, but did not do so in § 7301. *Third*, even OSHA lacks such power despite an enabling statute authorizing the agency to ensure "every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § 651; *see*

*NFIB*, 142 S. Ct. at 665–66. If a statute directly implicating employee health and safety doesn't authorize a vaccine mandate, then authority over employee "conduct" doesn't, either.

Moreover, implementation of §§ 3301, 3302, and 7301 has historically been limited to regulating conduct in an executive branch capacity, even when the targeted activity might occur outside the workplace. *See, e.g.*, 62 Fed. Reg. 43,451 (Aug. 9, 1997) (regulating "exposure to tobacco smoke *in the Federal workplace*"); 77 Fed. Reg. 24,339 (Apr. 18, 2012) ("prevent[ing] domestic violence *within the workplace*").

The government's invocation of President Reagan's executive order prohibiting illegal drug use is especially inapt given that drug use was *already* illegal under other laws, and the CSRA provides that employees can be immediately disciplined when there was "reasonable cause to believe the employee has committed a crime for which a sentence of imprisonment may be imposed." 5 U.S.C. §§ 7513(b)(1), 7543(b)(1). In addition, the executive order did not involve an irreversible status like being vaccinated, and it narrowly applied only to those employees with "sensitive positions," not to every federal employee.

The other executive orders cited by the government involved the regulation of conduct in or with a unique relationship to the workplace, required employees to follow preexisting laws, or involved statutory authority in addition to § 7301. Executive Order 10096, for example, provided that the government shall take title to inventions by government employees during workplace hours, using government resources, or which arose from official duties. 15 Fed. Reg. 389 (Jan. 25, 1950). Although Executive Order 11491 stated that internal union business should be conducted "during the non-duty hours of the employees concerned," it did nothing to mandate such out-of-work meetings, merely prohibiting the use of *working hours* for those purposes. 34 Fed. Reg. 17,605, 17,614 (Oct. 31, 1969). And Executive Order 12674 similarly prohibited conflicts of interest that arose *only because of* federal employment. 54 Fed. Reg. 15,159 (Apr. 14, 1989).[12]

---

[12] The government invokes the Department of State circular of March 20, 1841, but that circular predates the civil service altogether, and its substantive limits on political activity were later added in the Hatch Act, Pub. L. No. 76-252, 53 Stat. 1147 (1939), confirming that Congress—not the President acting unilaterally—has long played the leading role in regulating employee conduct outside the workplace.

Again, none of these examples involved acts with permanent and irreversible consequences outside the workplace, let alone medical procedures. It is telling that these fragments of easily distinguishable executive orders are the best precedents the government can muster. A vaccine mandate with no unique significance to federal employment is without precedent and amounts to "regulat[ing] the hazards of everyday life." *NFIB*, 142 S. Ct. at 665.

The government pivots by claiming vaccine mandates *do* regulate workplace conduct, Gov.Br.34, but as the District Court ruled, that theory is foreclosed by the Supreme Court's *NFIB* decision, which held that broad employee vaccine mandates are "public health measure[s]" "untethered, in any causal sense, from the workplace," and thus are not "*workplace* safety standards," 142 S. Ct. at 665, 666.

As the Sixth Circuit's opinion about the contractor mandate explains, all of the government's historical examples are "modest, 'work-anchored' measure[s] with an inbuilt limiting principle," but a vaccine mandate "requires vaccination everywhere and all the time"—"[i]t is not 'anchored' to the statutory text, nor is it even 'anchored' to the work of

federal contractors." *Kentucky*, 23 F.4th at 608. The same is true for federal employees.

When a general employment requirement has permanent and irreversible consequences outside the workplace, it can no longer be considered the regulation of "workplace conduct." Rather, it is a general health and safety measure unsupported by statutory text.

The breathtaking power asserted by the government confirms that its interpretation of § 7301 is wrong. The government has never disputed that its interpretation would provide the President with the authority to order every "civilian employee[] in the Executive Branch," Gov.EB.Br.33, to forgo birth control, undergo mandatory abortions or surgeries, ingest experimental or prescription medications, assume specific diets, or almost anything else conceivably labeled as "conduct," so long as the government can assert some generic potential benefit. In fact, the government claims that when it comes to federal civilian employees, § 7301 lets the President order or prohibit any "conduct" he wants, even "off-duty conduct," and even when it targets a person's immutable "status," unless Congress has expressly *prohibited* the President" from doing so. Gov.EB.Br.33–35. There is no "logical stopping point" to this

claim, which would amount to "a *de facto* police power [of] the President." *Kentucky*, 23 F.4th at 608; ROA.1766.

The government apparently believes such an expansive assertion of power is the only way it can justify EO14043. But that expansiveness only confirms that EO14043 is ultra vires.

## B. SEVERAL CLEAR-STATEMENT DOCTRINES CONFIRM THE LACK OF STATUTORY AUTHORITY.

Even if these statutes were ambiguous about the President's power to mandate medical procedures, several clear-statement doctrines confirm that the President's generic authority to issue "rules" and regulate "conduct" does *not* include the power to issue a broad vaccine mandate. *See West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (requiring more than a "colorable" or "plausible textual basis").

To begin, the Supreme Court has already recognized that widespread federal vaccine mandates implicate the major-questions doctrine, *see NFIB*, 142 S. Ct. at 665, which requires Congress to "speak[] clearly" when it delegates "powers of 'vast economic and political significance,'" *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021). That requirement is triggered here because the government asserts breathtaking power over every aspect of millions of employees' lives,

including highly controversial issues like vaccine mandates, as discussed above.

The federalism clear-statement canon is also directly implicated because this Court has made clear that "to mandate that a person receive a vaccine or undergo testing falls squarely within the States' police power." *BST Holdings*, 17 F.4th at 617. This canon applies despite employees' federal nexus. By imposing a generally applicable vaccine mandate on millions of federal employees, which carries permanent and irreversible non-workplace consequences, the government is not regulating federal employees *qua* employees but rather is imposing a general public-health measure. As the Sixth Circuit held in the context of the contractor mandate, the government is "fram[ing] the issue at the wrong level of generality" by focusing solely on the federal nexus of the group targeted, rather than the action taken. *Kentucky*, 23 F.4th at 610. It "certainly" implicates the federalism clear-statement canon "when the federal government seeks to usurp [the States'] roles by doing something that [the federal government] has no traditional prerogative to do—deploy [regulations] to mandate an irreversible medical procedure." *Id.*

A third clear-statement doctrine provides that "[w]here an administrative interpretation of a statute invokes the outer limits of Congress' power," Congress must provide "a clear indication that [it] intended that result." *Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172 (2001). This Court has held that broad vaccine mandates are at the outer limits of Congress's power. *BST Holdings*, 17 F.4th at 617.

Consistent with these clear-statement rules, when Congress authorizes mandatory vaccinations, it has done so expressly, including in areas where the President has inherent Article II power. *See* 8 U.S.C. § 1182(a)(1)(A)(ii) (mandating vaccines in immigration context). But Congress did not do so here.

The government previously argued that these clear-statement doctrines apply only when the government invokes *Chevron* deference. ROA.1546. That is wrong. The Supreme Court has repeatedly applied the major-questions doctrine when the government did not seek *Chevron* deference. *NFIB*, 142 S. Ct. at 665; *Ala. Ass'n*, 141 S. Ct. at 2489.

For the same reason, the Court should reject the government's argument—made only in passing below and thus forfeited—that the

canons apply to agency action but not to exercises of "presidential …

authority." ROA.1546; Gov.EB.Br.39. Agency actions always involve

presidential authority because the executive power is vested in the

President, *see* U.S. Const. art. II, § 1, and agencies are overseen by and

report to the President. If anything, canons like the major-questions

doctrine apply *more* strongly when the President's actions are directly at

issue. The major-questions doctrine "appl[ies] … in service of" the

nondelegation doctrine, *Gundy v. United States*, 139 S. Ct. 2116, 2142

(2019) (Gorsuch, J., dissenting), which the Supreme Court has applied

most stringently to authority delegated *directly* to the President, *see*

*A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935);

*Panama Ref. Co. v. Ryan*, 293 U.S. 388 (1935).

Finally, if Congress did give the Executive such dramatic power,

uncabined by statutory text, it would violate the nondelegation doctrine,

*see Gundy*, 139 S. Ct. at 2134–37 (Gorsuch, J., dissenting), but the Court

can avoid that issue by narrowly interpreting the statutory text, *see*

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 646

(1980) (plurality); ROA.123. Despite the government's claim,

Gov.EB.Br.40, the vaccine mandate here is no mere trivial regulation of

employment. It is a general health-and-safety measure and subject to standard nondelegation analysis as such.

### C. THE PRESIDENT LACKED INHERENT ARTICLE II POWER TO ISSUE THE VACCINE MANDATE.

The District Court also correctly held that the President lacked inherent Article II authority to issue the vaccine mandate. ROA.1765; *cf. BST Holdings*, 17 F.4th at 618 ("Nor can the Article II executive breathe new power into OSHA's [statutory] authority.").

Critically, the government does not argue that any part of the CSRA is unconstitutional, which forecloses reliance on inherent Article II power to circumvent the strictures of that statute. This Court can therefore assume without deciding that the CSRA's requirements are constitutional. Congress carefully prescribed specific and varying requirements governing entry into and management of the federal workforce, which would all become superfluous if the President could simply invoke Article II.

Moreover, conspicuously missing from the government's brief is any example of any President in the Nation's history who invoked inherent Article II authority to impose medical procedures of any type on civilian employees—let alone *every* employee. "The dearth of analogous historical

examples is strong evidence that [the provision] does not contain such a power," especially given that "the threat of absenteeism is hardly unique to COVID-19." *Kentucky*, 23 F.4th at 608; *see FTC v. Bunte Brothers, Inc.*, 312 U.S. 349, 352 (1941).

The government vaguely argues that refusal by line-level employees to confirm their vaccinated status somehow interferes with the President's "executive power," but the District Court made short work of that theory. ROA.1765–66. Vaccination status in no way interferes with the President's ability to direct how the law should be executed. The government's invocation of *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020); Gov.EB.Br.27, is inapplicable for two reasons. *First*, that case references the President's "administrative control" over certain officials, but mandating a permanent and irreversible medical procedure is hardly a mere "administrative" requirement. *Second*, Plaintiffs are line-level employees, not high-level "Officers of the United States" who exercise significant authority and are personally accountable to the President. The distinction between high-level officers and line-level employees dates back at least to the Supreme Court's seminal decision in *Myers v. United States*, 272 U.S. 52 (1926), which held that "the merit system rests with

Congress," *id.* at 174, even though the President had constitutional power to "remov[e] executive officers of the United States whom he has appointed by and with the advice and consent of the Senate," *id.* at 106. The CSRA limits whatever inherent authority the President might otherwise have to set the terms of civilian employment, and that is dispositive given that the government never contends the CSRA is unconstitutional.

* * *

Any interpretation giving the President such unfettered power over line-level federal employees would need to be based on clear textual or historical evidence—but the government has neither. A merely "colorable" or "plausible textual basis" will not do. *W. Virginia*, 142 S. Ct. at 2609. The District Court correctly held that the vaccine mandate is ultra vires.

## III. AGENCIES' IMPLEMENTATION OF THE MANDATE VIOLATES THE APA.

Although the District Court and panel did not reach the issue, the APA provides an alternative basis for affirmance. Rather than repeat that analysis verbatim, Plaintiffs respectfully direct the Court to their prior briefing on this matter at the panel stage. Pls.Br.47–54.

**IV.** **THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING THAT PLAINTIFFS FACE IMMINENT, IRREPARABLE HARM.**

"To show irreparable injury if threatened action is not enjoined, it is not necessary to demonstrate that harm is inevitable and irreparable." *Humana, Inc. v. Avram A. Jacobson, M.D.*, 804 F.2d 1390, 1394 (5th Cir. 1986). "The plaintiff need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not *fully* repair the harm." *Id.* (emphasis added). That is, even if money could partially repair the harm, it can still justify a preliminary injunction. A district court's finding here is reviewed only for an abuse of discretion. *Texas v. Biden*, 20 F.4th 928, 1001 (5th Cir. 2021).

This Court has already held that the unusual nature of putting employees to the choice of "their job(s) and their jab(s)" is irreparable—infringing on what this Court has called "the liberty interests of reluctant individual recipients"—and that resolves the matter here. ROA.1760; *BST Holdings*, 17 F.4th at 618; *see* ROA.776; *see also Sambrano v. United Airlines, Inc.*, No. 21-11159, 2022 WL 486610, at *24 (5th Cir. Feb. 17, 2022) (Smith, J., dissenting) ("When government exceeds the consent of the governed to deny the rights it has sworn to protect, that betrayal is a unique, freestanding, and immeasurable injury."). This case is even

easier because, unlike the private employees in *BST Holdings*, federal employees have no option to be tested in lieu of vaccination.

Even employees with pending medical and religious exemption requests would be subject to immediate and irreparable harm. Consider CIA employee George O'Sullivan, a Purple Heart recipient and 100% service-disabled veteran, whose religious objection was deemed bona fide, yet he was offered the "accommodation" of either being immediately disciplined or demoted with a $60,000 pay cut. ROA.1817. The government has thus demonstrated that it will compel religious adherents to "accept" vaccinations or demotions, and—just like those coerced into being vaccinated to save their jobs—thereby forgo any potential challenge to the vaccine mandate because they will have "voluntarily" been vaccinated or demoted.

Plaintiffs would also suffer other forms of irreparable harm. For instance, the District Court followed established Fifth Circuit precedent holding that there was no abuse of discretion in finding that government action "injur[ing]" an employee's "ability to procure comparable employment was sufficient to satisfy irreparable injury." *Burgess v. FDIC*, 871 F.3d 297, 304 (5th Cir. 2017); ROA.1760. The "comparable

employment" language defeats the government's claim that *Burgess* applies only where an employee would face "complete exclusion" from all jobs. Gov.EB.Br.44. Rehashing its incorrect CSRA claim, the government contends *Burgess* does not apply here because the CSRA provides a complex review scheme, but *Burgess* itself dealt with a reticulated federal discipline and review system inside the FDIC.

Further, employees with religious objections face a "crisis of conscience" that is irreparable: either choose between their jobs or their religious beliefs. *See Sambrano v. United Airlines, Inc.*, 19 F.4th 839, 841 (5th Cir. 2021) (Ho, J., dissenting); *Sambrano*, 2022 WL 486610, at *1; ROA.76; ROA.77. The government claims those with pending religious exemptions do not face any harm, but that is wrong, as shown by employees like Mr. O'Sullivan, discussed above. ROA.1817.

Plaintiffs also introduced below an affidavit from an employment expert—to which the government has forfeited any objection—stating that federal employees who resist the vaccine mandate will incur unique reputational harm and difficulty finding alternative employment that would never apply to mine-run federal employment actions because the

President labeled these employees lawbreakers and "kill[ers]." ROA.1184–85.

There are also the thousands of personal stories that the government has disregarded in its relentless campaign. For example, if Plaintiff Joshua Roberts loses his DHS job, he would likely be deemed unfit to adopt the two infants he and his wife have fostered since the babies were only a few weeks old. ROA.1227. If that is not irreparable, nothing is.

Nor can the government demonstrate that the harms described above were not *imminent*. The government's coercion campaign reached a fevered frenzy just before the injunction was issued, as agencies informed the media that discipline was imminent for those employees who were hold-outs—and the discipline would increase in severity for the express purpose of putting maximum coercive pressure on employees. *See* Alex Gangitano & Morgan Chalfant, *Federal Agencies Prepare to Act Against Unvaccinated Employees*, THE HILL (Jan. 9, 2022), https://thehill.com/homenews/administration/588836-federal-agencies-prepare-to-act-against-unvaccinated-employees/. After the panel decision issued in April, "agencies such as CBP have already begun

planning how to target employees who refuse to cooperate" if the vaccine mandate were to go back into effect. Anna Giaritelli, *Thousands of Unvaccinated Border Patrol Agents Fear for Their Future*, WASH. EXAMINER (June 7, 2022), https://www.washingtonexaminer.com/news/thousands-of-unvaccinated-border-patrol-agents-fear-for-their-future.

For these reasons, the district court did not abuse its discretion in finding irreparable harm.

## V. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING THAT THE PUBLIC INTEREST AND BALANCE OF HARMS FAVOR PLAINTIFFS.

To be sure, "the public has a strong interest in combating the spread of [COVID-19]. But our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n*, 141 S. Ct. at 2490; *BST Holdings*, 17 F.4th at 618 ("Any interest [the government] may claim in enforcing an unlawful" regulation "is illegitimate."). The illegality of the vaccine mandate resolves the matter. The public interest is "served by maintaining our constitutional structure and maintaining the liberty of individuals to make intensely personal decisions according to their own convictions." *BST Holdings*, 17 F.4th at 618. The District Court also correctly held—again, reviewable only for an abuse of discretion—that

the public interest will not be served "by terminating unvaccinated workers who provide vital services to the nation." ROA.1768.

In terms of balance of harms between the parties, Plaintiffs submitted over a dozen affidavits demonstrating several forms of irreparable harm, as demonstrated above. By contrast, the government's opposition to Plaintiffs' motion for a preliminary injunction failed to include *any* affidavit on the harms the government would allegedly suffer from an injunction. As a result, the Court should deem the government's subsequent claims of harm forfeited. But even if the Court did consider those untimely claims, they are unpersuasive.

*First*, the government itself has demonstrated that it faces no irreparable harm from being unable to enforce the vaccine mandate. Before the injunction issued, the government delayed the effective date of the mandate repeatedly, for months at a time. This delay included the winter holidays, despite the government simultaneously warning of a "surge upon a surge" of cases. Noah Higgins-Dunn, *Dr. Fauci Warns the U.S. Will See a 'Surge Upon a Surge' of Covid Cases Following the Holidays*, CNBC (Dec. 1, 2020), https://www.cnbc.com/2020/12/01/dr-fauci-warns-the-us-will-see-a-surge-upon-a-surge-of-covid-cases-

following-the-holidays.html. This suggests the government's sense of urgency depends largely on public optics, not actual harm.

Moreover, the Task Force recently recommended that agencies (1) "pause" the collection of employees' vaccine information and (2) treat vaccinated and unvaccinated employees the same. Task Force, *Initial Implementation Guidance for Federal Agencies* 3 (Aug. 17, 2022), https://www.saferfederalworkforce.gov/downloads/Initial%20Implement ation%20Guidance_CDC%20Streamline_20220817.pdf. The government can no longer plausibly contend that irreparable harm will result from being unable to enforce the vaccine mandate.

Before this Court, the government has expressly *disclaimed* any reliance on workplace spread of COVID-19 as a basis for the vaccine mandate, insisting that the purpose of the vaccine mandate "is not to protect employees from workplace hazards," but rather to "prevent the workplace disruption that occurs when federal employees become ill or are quarantined because of COVID-19." Gov't.Reply.Br.15. But even that argument is severely undercut by the Task Force's latest guidance. And the claim of potential absenteeism is contradicted by the government's statements to the media that agencies could fire or suspend all non-

compliant employees without suffering operational concerns. Gangitano & Chalfant, *supra*.

*Second*, the injunction has now been in place for over seven months, without evidence of irreparable harm to the government.

*Third*, the government has previously argued that it is irreparably harmed because "allowing the continued service" of unvaccinated employees "will damage good order and discipline." Gov.CA5.Addend.27. That is Orwellian: either comply with an illegal requirement, or the government will claim your lack of compliance hurts morale and thereby justifies keeping the illegal requirement in place.

## VI. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING THAT CLEAR AND BROAD RELIEF IS APPROPRIATE.

The government cannot show the District Court abused its discretion by granting broad relief. *Texas*, 809 F.3d at 187. The District Court noted that it "always will be terribly reluctant to go nationwide on injunctive relief," ROA.1858; but it was ultimately persuaded by the "unique facts" of this case, ROA.1770.

*First*, the President's own Task Force has announced that "consistency across government in enforcement of this government-wide

policy is desired." ROA.810. There is no abuse of discretion in imposing the same relief that Defendants want.

*Second*, broad relief complies with *Louisiana v. Becerra*, 20 F.4th 260 (5th Cir. 2021), which endorsed broad injunctions where the "circumstances" of the case call for it, such as when there is "a concern that 'a geographically-limited injunction would be ineffective.'" *Id.* Lead Plaintiff F4MF has over 6,000 registered members "spread across every state and in nearly every federal agency." ROA.1770. Intake survey data demonstrate that over 90% of F4MF members are federal employees. The government pejoratively questions whether these public servants are truly "members" of F4MF, Gov.EB.Br.48, but F4MF has already demonstrated via sworn declaration that it has standard indicia of membership like leaders who are members, and approximately 1,000 members have made significant financial contributions to fund *this litigation*. Pls.Addend.1.

Given the vast size of the membership body and its constantly changing characteristics—e.g., employees moving between states/ countries or agencies—there was no narrower scope of relief that could

be determined *ex ante* that would also guarantee "complete relief" to F4MF's members. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

Thus, by finding that tailored relief is not "practical in this case," ROA.1770, the District Court was indicating there are so many affected individuals that, without a clear and broad injunction, Defendants would undoubtedly impose harm on many people who had received judicial relief. *See League of Women Voters of United States v. Newby*, 838 F.3d 1, 8–9 (D.C. Cir. 2016) ("As a preliminary injunction requires only a likelihood of irreparable injury, Damocles's sword does not have to actually fall on all appellants before the court will issue an injunction.").

The government insists it could "easily" track thousands of F4MF members, Gov.Br.49, but the government has a poor track record of erroneously targeting employees. *See* ROA.1454; ROA.1464; ROA.1600; ROA.1625; ROA.1645.[13]

*Third*, the government's request to resume "process[ing]" exemption requests is especially insidious. Gov.Br.45. The government

---

[13] The government suggests in passing that only F4MF members at the time of the Complaint are entitled to relief. Gov.EB.Br.48. The government cites no authority for this theory. The lead Plaintiff is a membership organization, meaning the benefits of an ongoing injunction inure to that membership, including as it shrinks or grows.

has claimed that employees subject to that process "would not be injured." Gov.Mot.21. But remember CIA employee George O'Sullivan, the Purple Heart recipient and 100% service-disabled veteran discussed above. He was railroaded into a massive demotion despite a finding that his religious objection was sincere—shocking conduct for the federal government. ROA.1817. Ironically, the Chair of the CIA's accommodation committee submitted a sworn affidavit to the District Court stating that "the CIA maintains a diverse, inclusive, equitable, and accessible workplace where differences are valued, and conflicts are managed constructively." ROA.1592. "Inclusive" and "constructive," indeed.

## CONCLUSION

The Court should affirm the preliminary injunction.[14]

---

[14] If the Court reverses, Appellees request that it stay its mandate pending their subsequent petition for a writ of certiorari because this case raises at least "a substantial question," and "there is good cause for a stay," Fed.R.App.P.41(d)(1), namely that it would minimize disruption and the need for emergency motions practice.

August 26, 2022

Respectfully submitted,

/s/ R. Trent McCotter

C. Boyden Gray
R. Trent McCotter
  *Counsel of Record*
Jonathan Berry
Michael Buschbacher
Jared M. Kelson
BOYDEN GRAY & ASSOCIATES
801 17th Street NW, Suite 350
Washington, DC 20006
202-706-5488
mccotter@boydengrayassociates.com

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Fifth Circuit Rule 32 and Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,998 words, excluding the portions exempted by Rule 32(f). This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure Rule 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook and 14-point font

August 26, 2022

/s/ R. Trent McCotter
BOYDEN GRAY & ASSOCIATES PLLC
801 17th Street NW, Suite 350
Washington, DC 20006

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who have consented to electronic service are being served today with a copy of this document via the Court's CM/ECF. All parties in this case are represented by counsel consenting to electronic service.

August 26, 2022

/s/ R. Trent McCotter
BOYDEN GRAY & ASSOCIATES PLLC
801 17th Street NW, Suite 350
Washington, DC 20006